No. 25-10651

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

CARROLL INDEPENDENT SCHOOL DISTRICT,
*Plaintiff-Appellee*

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA
MCMAHON, SECRETARY, U.S. DEPARTMENT OF EDUCATION;
KIMBERLY RICHEY,* IN HER OFFICIAL CAPACITY AS
ASSISTANT SECRETARY FOR CIVIL RIGHTS AT THE UNITED
STATES DEPARTMENT OF EDUCATION; UNITED STATES
DEPARTMENT OF JUSTICE; PAMELA BONDI, U.S. ATTORNEY
GENERAL; HARMEET DHILLON, IN HER OFFICIAL CAPACITY AS
ASSISTANT ATTORNEY GENERAL FOR THE CIVIL RIGHTS
DIVISION OF THE UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellees*

VICTIM RIGHTS LAW CENTER; JANE DOE; A BETTER BALANCE,
*Movants-Appellants*

---

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 4:24-cv-00461
The Honorable Reed C. O'Connor

---

## BRIEF OF MOVANT-APPELLANT
## A BETTER BALANCE

---

*Counsel Listed on Inside Cover*

Marissa Benavides
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
(646) 876-5766
benavides@braunhagey.com


Matthew Borden
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
(415) 599-0210
borden@braunhagey.com

Alexandra Z. Brodsky
Sean Ouellette
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net


Leila Nasrolahi
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lnasrolahi@publicjustice.net

Counsel for Movant-Appellant A Better Balance

*\* The caption now reflects the recent confirmation of a new Assistant Secretary for Civil Rights.*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the number and style of the case are No. 25-10651, *Carroll Independent School District v. U.S. Department of Education, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### Movants-Appellants

A Better Balance, Jane Doe, Victim Rights Law Center

### Counsel for Movant-Appellant A Better Balance

Alexandra Z. Brodsky, Adele P. Kimmel, Sean Ouellette, and Leila Nasrolahi of Public Justice

Marissa Benavides, Matthew Borden, Kory DeClark, Lily (Haeun) Kim, and Christman Rice of BraunHagey & Borden LLP

Roger Mandel of the Jeeves Mandel Law Group

### Counsel for Movants-Appellants Victim Rights Law Center and Jane Doe

Shiwali Patel, Rachel Smith, Elizabeth Tang, and Elizabeth Theran of the National Women's Law Cetner

Ellen Eardley and Andrea Dobson-Forsee of Mehri & Skalet, P.L.L.C.

**Plaintiff-Appellee**

Carroll Independent School District

**Counsel for Plaintiff-Appellee**

John J. Bursch, Timothy E. Davis, Mathew W. Hoffman, Jonathan A. Scruggs, and Natalie D. Thompson of Alliance Defending Freedom

**Defendants-Appellees**

United States Department of Education; Linda McMahon, Secretary, U.S. Department of Education; Kimberly Richey, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; United States Department of Justice; Pamela Bondi, U.S. Attorney General; Harmeet Dhillon, in her official capacity as Assistant Attorney General for the Civil Rights Division of the United States Department of Justice

**Counsel for Defendants-Appellees**

Steven A. Myers, David Peters, and Charlie W. Scarborough of the U.S. Department of Justice

*/s/ Alexandra Z. Brodsky*
Alexandra Z. Brodsky
*Counsel for Movant-Appellant*
*A Better Balance*

## REQUEST FOR ORAL ARGUMENT

This lawsuit is a challenge to three parts of a regulation the U.S. Department of Education promulgated under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. In this appeal, A Better Balance seeks to intervene to ask this Court to narrow the judgment below to allow an unchallenged part of the regulation to go into effect. That provision, if revived, would provide pregnant and postpartum students much needed protections for their educations, their health, and the health of their babies. However, the district court denied A Better Balance's motion to intervene on standing grounds. Given the importance of the substantive protections at issue and the standing question, A Better Balance believes that oral argument would aid in the consideration of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS............................................i

REQUEST FOR ORAL ARGUMENT.................................................. iii

TABLE OF CONTENTS ...............................................................iv

TABLE OF AUTHORITIES .......................................................... vi

STATEMENT OF JURISDICTION...........................................1

INTRODUCTION .............................................................2

STATEMENT OF THE ISSUES................................................4

STATEMENT OF THE CASE .................................................4

I.     Pregnant and postpartum students face significant
       discrimination....................................................4

II.    Longstanding Title IX regulations offer limited rights for
       pregnant and postpartum students...............................6

III.   The U.S. Department of Education promulgates new Title IX
       regulations to strengthen protections for pregnant and
       postpartum students, among others.............................10

IV.    The district court vacates the unchallenged pregnancy-related
       provisions of the Rule........................................12

V.     A Better Balance moves to intervene to defend the pregnancy-
       related provision of the Rule.................................14

SUMMARY OF THE ARGUMENT .........................................16

ARGUMENT .................................................................18

I.     A Better Balance has standing ................................18

       A.    A Better Balance has standing because the vacatur impairs
             its core activities and drains its resources..............19

             1.    A Better Balance has suffered an injury-in-fact ........19

             2.    ABB has established causation and redressability.....37

       B.    ABB has standing based on its procedural injury. ...........38

II.    This Court should permit A Better Balance to intervene ............42

A.    A Better Balance is entitled to intervene ............................... 42

     1.    ABB's motion is timely ................................ 43

     2.    ABB has substantial interests in part of the Rule ...... 47

     3.    ABB's interests will be impaired if it cannot intervene ........................................................... 49

     4.    The existing parties do not adequately protect ABB's interests ......................................................... 50

B.    The Court should grant A Better Balance permissive intervention ................................................................. 51

III.    This Court should revive the unchallenged pregnancy provision because it is severable from the provisions the district court found unlawful ................................................................ 54

A.    The Department intended for the Rule to be severable ........ 55

B.    The unchallenged pregnancy regulations operate independently of the provisions held unlawful—and any other part of the Rule ............................................... 58

C.    Earlier rulings in *Louisiana* are not to the contrary ............ 64

CONCLUSION ............................................................... 66

CERTIFICATE OF SERVICE .................................................. 68

CERTIFICATE OF COMPLIANCE ........................................... 69

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alaska Airlines, Inc. v. Donovan,*
766 F.2d 1550 (D.C. Cir. 1985) ............................................................ 55

*Ams. United for Separation of Church & State v. City of Grand Rapids,*
922 F.2d 303 (6th Cir. 1990) ................................................................ 50

*Arizona v. City & Cnty. of S.F.,*
596 U.S. 763 (2022) ...................................................................... 39, 40

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) .......................................................... 26, 36

*Ass'n of Pro. Flight Attendants v. Gibbs,*
804 F.2d 318 (5th Cir. 1986) ................................................................ 45

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) ............................................................................. 41

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ..................................................................... *passim*

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
72 F.4th 284 (D.C. Cir. 2023) ....................................................... 54, 55

*Belt v. EmCare, Inc.,*
444 F.3d 403 (5th Cir. 2006) ................................................................ 62

*Brumfield v. Dodd,*
749 F.3d 339 (5th Cir. 2014) .......................................................... 43, 48

*Deep S. Ctr. for Env't Just. v. EPA,*
138 F.4th 310 (5th Cir. 2025) ................................................... 30, 31, 32

*DeOtte v. State,*
20 F.4th 1055 (5th Cir. 2021) .............................................................. 19

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ............................................................ 39

*Dep't of Educ. v. Louisiana,*
   603 U.S. 866 (2024) ..................................................... 65, 66

*Edwards v. City of Houston,*
   78 F.3d 983 (5th Cir. 1996) ......................................... *passim*

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) .......................................... 25, 27, 28, 38

*Food Mktg. Inst. v. Argus Leader Media,*
   588 U.S. 427 (2019) ............................................................ 19

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) .................................................. 24, 25, 37

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
   572 U.S. 559 (2014) ............................................................ 52

*In re Coastal Plains, Inc.,*
   179 F.3d 197 (5th Cir. 1999) .............................................. 51

*In re Hearn,*
   376 F.3d 447 (5th Cir. 2004) .............................................. 31

*In re Lease Oil Antitrust Litig.,*
   570 F.3d 244 (5th Cir. 2009) .............................................. 45

*K Mart Corp. v. Cartier, Inc.,*
   486 U.S. 281 (1988) ............................................................ 55

*Kneeland v. Nat'l Collegiate Athletic Ass'n,*
   806 F.2d 1285 (5th Cir. 1987) ................................. 45, 52, 53

*Knight v. Kirby Offshore Marine Pac., L.L.C.,*
   983 F.3d 172 (5th Cir. 2020) .............................................. 32

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden
   Properties, L.L.C.,*
   82 F.4th 345 (5th Cir. 2023) ...................................... *passim*

vii

*La Union del Pueblo Entero v. Abbott*,
   29 F.4th 299 (5th Cir. 2022) .............................................. 43, 48, 49, 50

*League of Latin Am. Citizens, Dist. 19 v. City of Boerne*,
   659 F.3d 421 (5th Cir. 2011).................................................... 51

*Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*,
   No. 24-30399, 2024 WL 3452887 (5th Cir. 2024) ........................... 65

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................. 41

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................. 41

*Matter of Highland Cap. Mgmt., L.P.*,
   74 F.4th 361 (5th Cir. 2023) ................................................. 28

*Merrill v. Milligan*,
   142 S.Ct. 879 (2022) ........................................................... 66

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
   60 F.4th 956 (5th Cir. 2023) ................................................. 62

*Nairne v. Landry*,
   151 F.4th 666 (5th Cir. 2025) ....................................... *passim*

*Nat'l Ass'n of Mfrs. v. U.S. SEC*,
   105 F.4th 802 (5th Cir. 2024) ............................................... 55

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
   116 F.4th 488 (5th Cir. 2024) ...................................... 38, 40, 41

*Newby v. Enron Corp.*,
   443 F.3d 416 (5th Cir. 2006).................................................. 53

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017)..................................... 26, 27, 29, 35

*PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*,
   438 F.3d 1184 (D.C. Cir. 2006)............................................... 61

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ............................................................. 38

*Piantanida v. Wyman Ctr., Inc.,*
  116 F.3d 340 (8th Cir. 1997) ............................................. 62

*Ross v. Marshall,*
  426 F.3d 745 (5th Cir. 2005) ................................. 44, 47, 50

*Saks v. Franklin Covey Co.,*
  316 F.3d 337 (2d Cir. 2003) .............................................. 62

*Seila L. LLC v. CFPB,*
  591 U.S. 197 (2020) ............................................. 54, 56, 57

*Sierra Club v. Espy,*
  18 F.3d 1202 (5th Cir. 1994) .................................. 43, 44, 46

*Stallworth v. Monsanto Co.,*
  558 F.2d 257 (5th Cir. 1977) ............................................. 52

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) .............................................. 18

*Texas v. United States,*
  126 F.4th 392 (5th Cir. 2025) ...................................... *passim*

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) .............................................. 54

*Texas v. United States,*
  805 F.3d 653 (5th Cir. 2015) ............................ 42, 48, 49, 50

*United Airlines, Inc. v. McDonald,*
  432 U.S. 385 (1977) ........................................ 42, 44, 46, 53

*Vote.Org v. Callanen,*
  89 F.4th 459 (5th Cir. 2023) .............................................. 25

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*
  834 F.3d 562 (5th Cir. 2016) .............................................. 48

## Statutes and Rules

5 U.S.C. § 553(c) ................................................................ 38

5 U.S.C. § 706 ...................................................................... 1

20 U.S.C. § 1681(a) ............................................................... 6

20 U.S.C. § 1681 et seq. ......................................................iii

20 U.S.C. § 1682 ................................................................... 6

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 2201 ................................................................... 1

42 U.S.C. § 2000e(k) ........................................................... 62

Department of Education Organization Act, Pub. L. No. 96-
    88, 93 Stat. 669 (1979) ................................................... 7

Fed. R. App. P. 4(a)(1)(B) ................................................. 44

Fed. R. Civ. P. 24(a)(2) ...................................................... 47

Fed. R. Civ. P 24(a) ............................................... 17, 48, 49

## Regulations

34 C.F.R. § 106.10 (2024) ........................................... 13, 59

34 C.F.R. § 106.16 (1980) ................................................. 64

34 C.F.R. § 106.17 (1980) ................................................. 64

34 C.F.R. § 106.2 (1980) ................................................... 61

34 C.F.R § 106.2 (2020) .................................................... 64

34 C.F.R. § 106.2 (2024) ........................................... *passim*

34 C.F.R. § 106.24 (2024) ................................................. 56

34 C.F.R. § 106.30 (2020) ........................................................................ 64

34 C.F.R. § 106.31(a)(2) (2024) .............................................................. 13

34 C.F.R. § 106.40 (2024) .......................................................... 2, 4, 11, 66

34 C.F.R. § 106.40(b)(2) (2024) ............................................ 12, 22, 24, 25

34 C.F.R. § 106.40(b)(3)(ii) (2024) ................................................... 11, 21

34 C.F.R. § 106.40(b)(3)(v) (2024) ......................................................... 22

34 C.F.R. § 106.40(b)(4) (1980) ................................................................ 8

34 C.F.R. § 106.44(f)(1) (2024) ............................................................... 13

34 C.F.R. § 106.44(f)(1)(v) (2024) .......................................................... 13

34 C.F.R. § 106.45(b)(5) (2024) .............................................................. 13

34 C.F.R. § 106.48 (2024) ........................................................................ 56

34 C.F.R. § 106.62 (2024) ........................................................................ 56

34 C.F.R. § 106.72 (2024) ........................................................................ 56

34 C.F.R. § 106.82 (2024) ........................................................................ 56

34 C.F.R. § 106.9 (2024) .......................................................................... 56

45 C.F.R. § 86.40 (1975) ............................................................................ 7

Establishment of Title and Chapters, 45 Fed. Reg. 30,802
    (May 9, 1980) .......................................................................................... 7

Nondiscrimination on the Basis of Sex in Education
    Programs or Activities Receiving Federal Financial
    Assistance, 87 Fed. Reg. 41,390 (July 12, 2022) ......................... *passim*

Nondiscrimination on the Basis of Sex in Education
    Programs or Activities Receiving Federal Financial
    Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ........................ *passim*

Nondiscrimination on the Basis of Sex in Education
Programs and Activities Receiving or Benefiting from
Federal Financial Assistance, 40 Fed. Reg. 24,128 (June
4, 1975) ..................................................................................... 6

## Other Authorities

7 Charles Alan Wright & Arthur R. Miller, *Federal Practice
& Procedure* § 1908.2 (3d ed. 2025) ...................................... 49

Bethany A. Davis Noll & Richard L. Revesz, *Regulation in
Transition*, 104 Minn. L. Rev. 1 (2019) ................................. 39

EEOC, *Enforcement Guidance on Pregnancy Discrimination
and Related Issues* (June 25, 2015),
https://perma.cc/83KG-7SGZ .............................................. 62

Peter Fox & Connor Raso, *What a Biden Administration
Should Learn from the Trump Administration's
Regulatory Reversals*, Brookings (Sept. 28, 2020),
https://perma.cc/G8DP-FLCG ............................................. 39

U.S. Dep't of Educ., Dear Colleague Letter (Jan. 31, 2025),
https://perma.cc/FEQ5-93Q4 ........................................ 39, 42

U.S. Dep't of Educ., Letter to Hinds Community College
(April 11, 2024), https://perma.cc/PBD2-GT7Z ................. 7, 9

U.S. Dep't of Educ., Letter to Troy University (Jan. 26,
2023), https://perma.cc/A77C-6U2H ...................................... 8

U.S. Dep't of Educ., Letter to Salt Lake Community College
(June 14, 2022), https://perma.cc/HT8A-6Z4V ...................... 8

U.S. Dep't of Educ., Letter to Virginia Military Institute
(May 9, 2014), https://perma.cc/J923-YR8D ......................... 8

U.S. Dep't of Educ., Resolution Agreement with Burlington
School District RE-6J (Feb. 3, 2014),
https://perma.cc/WF4P-NRME .............................................. 8

## STATEMENT OF JURISDICTION

Carroll Independent School District filed this lawsuit under the Administrative Procedure Act, 5 U.S.C. § 706, and Declaratory Judgment Act, 28 U.S.C. § 2201. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court entered a final judgment in favor of the plaintiff on February 19, 2025, ROA.4875, and extended the time to file a notice of appeal until May 21, 2025, ROA.5358. A Better Balance filed its notice of appeal on May 21, 2025. ROA.5558-60. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

Portions of the Title IX regulations at issue in this case have been the subject of litigation and public debate since they were published in 2024. But no one objects to the provision A Better Balance (ABB) seeks to defend: a set of protections for pregnant and postpartum students. This provision, codified at 34 C.F.R. § 106.40 (2024), reflects common sense and empathy. For example, it requires schools to reschedule an exam that conflicts with a pregnant student's due date and to provide postpartum students breaks to express milk, so they can breastfeed their babies without medical complications. When Carroll Independent School District (Carroll) filed this lawsuit challenging other parts of the regulation—related to gender identity, sexual orientation, and harassment—it did not mention the pregnancy-related provision, let alone claim to be injured by it.

Nonetheless, Carroll asked the district court to vacate the 2024 regulations in full, including the unobjectionable pregnancy-related provision, and the court did so. Soon after, ABB sought to intervene in this case to defend that provision, concerned that, after a change in presidential administration, the federal government might no longer

defend its regulations. Both the government and Carroll opposed ABB's intervention, even though, to this day, neither has voiced any objection to the pregnancy protections ABB seeks to defend.

The district court denied ABB's motion to intervene on standing grounds. That was ironic, given that the current parties to the case are uninjured by the provision in question—Carroll certainly lacks standing to challenge it—but ABB's services to pregnant and postpartum students (and workers) are directly impaired by the district court's vacatur. The district court's decision was also premised on a misreading of standing precedent that this Court has recently clarified and reaffirmed.

This Court should allow ABB to intervene in the case, and it should narrow the district court's remedy to revive the pregnancy provision. The regulation's plain text leaves no doubt that the Department of Education intended for the rule to be severable: Even if courts struck down some provisions, the Department wanted the rest to remain in effect. And the pregnancy provision can operate independently of the parts of the Rule the district court found unlawful. Indeed, it can operate without any of the other 2024 amendments. Accordingly, the district court erred in departing from the presumption of severability, and this Court should

3

narrow its vacatur to allow pregnant and postpartum students to enjoy important protections for their educations and their families' health.

## STATEMENT OF THE ISSUES

I.     Whether ABB has standing to intervene in this case for purposes of appeal.

II.     Whether ABB is entitled to mandatory intervention or, in the alternative, if this Court should grant it permissive intervention.

III.     Whether the three portions of the 2024 Title IX regulations the district court found unlawful are severable from the pregnancy-related provision, codified at 34 C.F.R. § 106.40.

## STATEMENT OF THE CASE

### I.     Pregnant and postpartum students face significant discrimination

Because of discrimination, pregnant and postpartum students too often must "choose between their health and education." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474, 33,773 (Apr. 29, 2024); *see, e.g., id.* at 33,811. Some students face outright exclusion—such as removal from school activities and forced transfers to

new schools—because they are expecting or are new moms. *See, e.g.*, *id.* at 33,479.

Other schools put pregnant and postpartum students in an impossible bind by failing to provide simple accommodations that would allow those students to continue to pursue their educations while taking care of themselves and their families. "Schools have, for example, refus[ed] to modify an exam schedule or grading policy when a student gave birth during final exams" and denied a pregnant student's "request for a larger desk." *Id.* at 33,773; *see* ROA.4919-4920 (¶¶ 17-19). As a result, some of these students "face partial or total exclusion from education and a loss of future economic stability." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,513 (July 12, 2022); *see* ROA.4919-4920 (¶¶ 18-19).

Schools also often fail to provide accommodations for postpartum students to express milk. *See, e.g.*, 89 Fed. Reg. at 33,479, 33,773, 33,786; 87 Fed. Reg. at 41,522; ROA.4921-4922 (¶¶ 25-27). Breastfeeding offers significant health benefits. *See, e.g.*, 89 Fed Reg. at 33,787. In order to maintain their milk supply and avoid medical complications, postpartum

students require time, and clean space, to express milk. *See, e.g.*, *id.* at 33,786-87; 87 Fed. Reg. at 41,514, 41,522; ROA.4921-22 (¶¶ 25-27). When schools refuse to allow students to take breaks to express milk, or to provide them space to do so, those students' health, and their babies' health, suffer. *See* 89 Fed. Reg. at 33,786; 87 Fed. Reg. at 41,522. So do their educations: When schools fail to provide basic accommodations, some students sacrifice learning opportunities—missing classes or dropping out of school—in order to ensure they can continue to breastfeed. *See* 89 Fed. Reg. at 33,786-87; 87 Fed. Reg. at 41,513, 41,522.

## II.   Longstanding Title IX regulations offer limited rights for pregnant and postpartum students

Title IX of the Education Amendments of 1972 prohibits sex discrimination in federally funded education programs or activities. *See* 20 U.S.C. § 1681(a). In passing the law, Congress endowed federal agencies that provide funding to schools with authority to promulgate regulations to effectuate the law. 20 U.S.C. § 1682. Three years later, the U.S. Department of Health, Education, and Welfare did so. *See* Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. pt. 86).

6

Consistent with the breadth of the statute, these regulations addressed a wide range of forms of sex discrimination, including discrimination against students based on "[p]regnancy and related conditions." 45 C.F.R. § 86.40 (1975). For example, they provided that a "recipient shall not … exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy" or related condition. *Id.* § 86.40(b)(1).

In 1979, Congress created the U.S. Department of Education and charged it with enforcing Title IX. *See* Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 669 (1979) (codified at 20 U.S.C. §§ 3401-3510). The next year, the new Department re-published the Title IX pregnancy regulation at a new place in the federal register without making substantive changes. *See* Establishment of Title and Chapters, 45 Fed. Reg. 30,802, 30,959 (May 9, 1980) (codified at 34 C.F.R. § 106.40). The Department enforced these regulations, in part, by investigating complaints of pregnancy-based discrimination and entering into voluntary resolutions with schools to come into compliance with Title IX by improving their pregnancy-related policies and practices. *See, e.g.*, U.S. Dep't of Educ., Letter to Hinds Community College (April 11, 2024),

https://perma.cc/PBD2-GT7Z; U.S. Dep't of Educ., Letter to Troy University (Jan. 26, 2023), https://perma.cc/A77C-6U2H; U.S. Dep't of Educ., Letter to Salt Lake Community College (June 14, 2022), https://perma.cc/HT8A-6Z4V; U.S. Dep't of Educ., Letter to Virginia Military Institute (May 9, 2014), https://perma.cc/J923-YR8D; U.S. Dep't of Educ., Resolution Agreement with Burlington School District RE-6J, 3-4 (Feb. 3, 2014), https://perma.cc/WF4P-NRME.

Nonetheless, discrimination against pregnant and postpartum students continues. *See supra* pp. 4-6. In 2021 and 2022, the Department heard about this ongoing problem from the public in a series of hearings, meetings, and comments. "Several stakeholders told the Department that the [pre-2024] regulations [were] not sufficient to ensure full access to educational and employment opportunities for students and employees who are pregnant, experiencing pregnancy-related conditions, or who have been pregnant." 87 Fed. Reg. at 41,513.

Part of the problem is that the 1975 regulations require schools to provide pregnant students only those accommodations the school offers to students with temporary disabilities. 34 C.F.R. § 106.40(b)(4) (1980). "[S]ome recipients do not maintain policies related to temporary

disability of students, leaving their responsibilities to pregnant students
… unclear." 87 Fed. Reg. at 41,523. And if a school mistreats students
with temporary disabilities, it has license to mistreat pregnant students,
too.

The 1975 regulations' prohibitions on pregnancy discrimination are
also insufficient because they are broadly worded but vague, open to
divergent interpretations. *See* ROA.4920-21, 4923-24 (¶¶ 21, 28, 30). For
example, when enforcing those regulations, the Department has
suggested that Title IX requires schools to provide breastfeeding
students time and space to express milk. *See* Letter to Hinds Community
College, *supra*, at 6-8. But, because the 1975 regulation does not
specifically discuss lactation, schools can, and do, disagree. *See*
ROA.4923-24 (¶ 30).

Moreover, many pregnant and postpartum students do not know
they are protected by Title IX and do not know how to ask their schools
for help. *See, e.g.*, 89 Fed. Reg. at 33,551, 33,771; 87 Fed. Reg. 41,513;
ROA.4924 (¶ 32). "Even though Title IX regulations have prohibited
discrimination based on pregnancy or related conditions since 1975,
feedback that the Department received … demonstrated that many

employees and students were unaware of these protections." 89 Fed. Reg. at 33,551. One comment "shared the experience of someone who was excluded from school activities due to pregnancy and was required to attend a different school farther away, without transportation." *Id.* at 33,479. That comment noted that the student had not understood that this exclusion violated Title IX; had she "understood her rights[,] … more could have been done to protect her right to continue her education at the original school." *Id.*; *see also id.* at 33,771 (noting "[s]everal commenters shared personal accounts of how their lack of awareness of their rights as pregnant or parenting students led them to lose instructional time and other educational opportunities").

## III.  The U.S. Department of Education promulgates new Title IX regulations to strengthen protections for pregnant and postpartum students, among others

In 2022, the Department proposed updating its Title IX regulations. *See* 87 Fed. Reg. at 41,390. Like the 1975 regulations, these new proposed rules would cover a range of topics. *Id.* at 41,390-91. These included discrimination based on sexual orientation or gender identity, sexual harassment, and the rights of pregnant and postpartum students. *Id.* at 41,531, 41,410, 41,515. In response to its notice of proposed rulemaking,

the Department received over 240,000 comments. 89 Fed. Reg. at 33,477.

Some of these addressed the proposed pregnancy-related protections. *Id.*

at 33,479.

In April 2024, the Department published its final regulation (the

Rule), which it scheduled to go into effect on August 1 of the same year.

*Id.* at 33,474-78. The Rule contained a provision that offered protections

for pregnant and postpartum students that were stronger and clearer

than those offered by the 1975 Title IX regulations. *See, e.g.*, *id.* at 33,755-

801; ROA.4917-18, 4920-25 (¶¶ 11, 21-22, 27-29, 31-34). This provision

was codified at 34 C.F.R. § 106.40, replacing the previous version of Title

IX's pregnancy-related regulations codified in the same place. 89 Fed.

Reg. at 33,765. The new pregnancy-related provision offered three

primary improvements on the earlier iteration:

*First*, the Rule newly granted pregnant and postpartum students

an explicit right to "reasonable modifications." 34 C.F.R. § 106.40(b)(3)(ii)

(2024). The Rule provided illustrative examples of such reasonable

modifications, including larger desks to fit growing stomachs, permission

to eat or drink, permission to use the restroom, adjusted exam dates, and

excused absences for prenatal care. *Id.*

*Second*, the Rule newly specified that breaks to lactate are reasonable modifications, and that schools must also provide breastfeeding students a private space to express milk. *Id.* §§ 106.40(b)(3)(ii), 106.40(b)(3)(v).

*Third,* the Rule newly required that, when students disclose their pregnancies, schools provide them with information about their Title IX rights and contact information for the school's Title IX coordinator, who can help them request and receive the support they need. *Id.* § 106.40(b)(2).

## IV.    The district court vacates the unchallenged pregnancy-related provisions of the Rule

After the Department published the Rule, Carroll filed this Administrative Procedure Act (APA) lawsuit in the Northern District of Texas against a group of federal agencies and officials: the U.S. Department of Education, the U.S. Secretary of Education, the Assistant Secretary for Civil Rights at the U.S. Department of Education, the U.S. Department of Justice, the Attorney General, and the Assistant Attorney General for the Civil Rights Division of the Department of Justice (collectively, "the Government"). *See* ROA.36-38 (¶¶ 45-59).

In its complaint, Carroll asked the court to declare unlawful and set aside five parts of the Rule: (1) a definition of sex discrimination that included discrimination based on gender identity, 34 C.F.R. § 106.10 (2024); (2) a "de minimis harm" provision that, in conjunction with the challenged definition, would require schools to permit transgender students to use some sex-segregated facilities and participate in some sex-segregated activities consistent with their gender identities, *id.* § 106.31(a)(2); (3) the elimination of the actual knowledge and deliberate indifference requirement for sex discrimination, *id.* § 106.44(f)(1); (4) criteria for when a Title IX coordinator may self-initiate a grievance process, *id.* § 106.44(f)(1)(v); and (5) privacy protections during grievance procedures, *id.* § 106.45(b)(5). ROA.82. In its motion for a preliminary injunction, Carroll also objected to the Rule's definition of hostile environment harassment, 34 C.F.R. § 106.2 (2024). ROA.145.

Carroll did not argue that the pregnancy-related provision was unlawful, or that it was injured by it. *See* ROA.38-81. Initially, when the district court entered a preliminary injunction, it specifically prohibited the Government from enforcing four of the challenged provisions against Carroll. ROA.925. (The order was ambiguous as to whether it enjoined

enforcement of the rest of the Rule. *See id.*) Then, on summary judgment, the district court set aside the full Rule, including the pregnancy provision, even though it only found three provisions unlawful: the inclusion of gender identity discrimination in the basis of sex-based discrimination, the de-minimis harm standard, and the definition of hostile-environment harassment. ROA.4870-74. The district court did not address the Government's arguments that the challenged provisions were severable from the rest of the Rule. *See, e.g.*, ROA.1754-1758, 4834-4836, 4867-4874.

## V.    A Better Balance moves to intervene to defend the pregnancy-related provision of the Rule

ABB is a national nonprofit organization that works to protect the rights of pregnant, parenting, and caregiving workers and students, including the provision of direct legal services. ROA.4915 (¶ 2). The vacatur of the Rule's pregnancy provision directly harmed its services to pregnant and postpartum students. *See infra* Part I.A.1.

On March 25, 2025, ABB moved to intervene in this case for the purpose of appealing the district court's vacatur of the Rule's pregnancy-related provision. ROA.4883-4914. It did so because it correctly predicted the Government, under new leadership, would not continue to defend the

Rule. From the start of the suit through the end of summary judgment briefing, the Government had defended the Rule from Carroll's suit. *See, e.g.*, ROA.720-22, 4807-4838. And, in the weeks after the district court's vacatur, the Government represented in court filings that it was considering appealing both that decision and another vacatur of the Rule ordered by a Kentucky district court. *See* ROA.4863-64, ROA.5057. Ultimately, the Government declined to file a notice of appeal, due March 10, 2025, in the Kentucky case, ROA.5071-72—a clear sign that the Government would not appeal in this case, either. So, ABB sought to defend the pregnancy-related provision on appeal in the Government's stead.

Carroll and the Government both opposed ABB's motion to intervene. ROA.5381-5413; ROA.5294-5302. To provide time for consideration of the motion, as well as a separate motion filed by other proposed defendant-intervenors, the court extended the time to notice an appeal until May 21, 2025. ROA.5358. On May 15, 2025, the district court denied ABB's motion to intervene because, in the court's view, it lacked standing to appeal. ROA.5539-5554. The district court found that ABB "must expend more time and other resources to counsel student-callers"

due to the Rule's vacatur, and it acknowledged that ABB alleged it "could provide more comprehensive representation to its callers" if the Rule took effect. ROA.5545-5546 (citation modified). Still, the court believed that these "alleged injuries" had not "perceptibly impaired [ABB's] ability to carry out its mission" because ABB was "still able to provide legal services and advocate for [its] clients in the absence of the Final Rule." ROA.5545, 5551. On May 21, 2025, ABB filed a timely notice of appeal to this Court. ROA.5558-60.

## SUMMARY OF THE ARGUMENT

I. ABB has Article III standing based on its diversion of resources and procedural injury.

I.A. As to the diversion of resources, the district court's vacatur causes ABB an injury-in-fact because it directly interferes with one of ABB's core activities: the helpline through which it counsels pregnant and postpartum students and workers. Because of the vacatur, ABB's direct services to these callers achieve worse results while taking more time and resources. As a result, ABB can counsel fewer callers, and cannot offer to represent as many callers as it would like. The vacatur

causes that injury, which would be redressed by a favorable opinion from this Court.

I.B. ABB also has standing because it has suffered a procedural injury. To repeal a regulation, a federal agency must go through the APA's notice-and-comment process. Had the Department done so here, ABB would have had the opportunity to file a comment in defense of the pregnancy provision. But, after a change in administration, the Government instead seized upon the judgments against it and opposed ABB's and other putative intervenors' attempts to defend the Rule. In doing so, the Government violated ABB's procedural rights, which ABB otherwise could have exercised to protect its concrete interest in the pregnancy provision.

II.A. ABB is entitled to mandatory intervention under Federal Rule of Civil Procedure 24(a). Its motion to intervene was timely filed before the deadline to notice an appeal had run, and soon after ABB learned the Government might no longer represent its interests. For the same reasons it has standing, ABB has substantial interests in the Rule's pregnancy provision. And no party contests that those injuries will be

impaired if ABB cannot intervene to defend that provision, and that the existing parties do not adequately represent ABB's interests.

II.B. In the alternative, this Court should grant ABB permissive intervention. ABB's motion identifies common questions of law or fact with the existing action. Its interests are not adequately represented by the existing parties. And its intervention will not cause undue delay and prejudice to the original parties.

III. The Court should narrow the district court's remedy to revive the pregnancy provision. The party seeking to vacate a rule bears the burden to overcome the presumption that a regulation is severable. Carroll has not done so here. The Department's repeated severability clauses leave no doubt that it intended for the Rule to be severable. And the pregnancy provision can survive without the parts of the Rule the district court found were unlawful—or any other part of the Rule.

## ARGUMENT

## I.   A Better Balance has standing

This Court "review[s] standing *de novo*." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 252 (5th Cir. 2022). When an organization seeks to intervene to appeal a lower court judgment, it has standing if "it has

suffered an actual or imminent injury that is fairly traceable to the judgment below and that could be redressed by a favorable ruling.'" *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 432-33 (2019) (citation modified). "Appellate standing is measured at the time of filing the notice of appeal … ." *DeOtte v. State*, 20 F.4th 1055, 1070 (5th Cir. 2021). ABB has standing to appeal the judgment vacating the Rule for two distinct reasons.

### A. A Better Balance has standing because the vacatur impairs its core activities and drains its resources

### 1. A Better Balance has suffered an injury-in-fact

1. No less than a for-profit business, a non-profit organization suffers an injury-in-fact when something "'perceptibly impair[s]' the organization's activities" and "drain[s] [its] resources." *Nairne v. Landry*, 151 F.4th 666, 680 (5th Cir. 2025) (quoting *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020)). A challenged action inflicts such an injury when it "directly interferes with [the organization's] 'core business activities'" by "frustrat[ing] the organization's normal … activities" and forcing it to spend "'additional time and effort'" to serve its target population. *Id.* at 681-82 (first quoting *FDA v. All. for Hippocratic Med.*,

602 U.S. 367, 395 (2024) (*"Alliance"*), then quoting *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017)).

The vacatur "perceptibly impair[s]" and "directly interferes with" one of ABB's most important programs: the direct services it provides for pregnant and parenting students and workers. *Nairne*, 151 F.4th at 682 (citation omitted). In furtherance of its mission to "protect the rights" of this population, ABB offers a free legal helpline to counsel pregnant and parenting students who face discrimination. ROA.4915, 4917 (¶¶ 2, 6-7). Without the Rule, it is much harder for ABB to provide that assistance. The Rule defines clear and specific rights for pregnant and parenting students that past regulations did not. Absent those clear protections, ABB lawyers must spend significantly more time and resources to respond to each call, yet they achieve worse results for callers. ROA.4917-26 (¶¶ 6-37). And because ABB must devote more time to each caller, it cannot provide as many services to as many people. ROA.4925 (¶ 35).

If the Rule were in effect, for example, ABB could quickly point postpartum callers to the provision of the regulation that requires their schools to provide them specifically identified reasonable "modifications" and private spaces to lactate. ROA.4919, 4921 (¶¶ 15-16, 24-25). Without

the Rule, ABB must instead conduct research and craft individualized arguments for why these callers' schools should provide these accommodations, since these rights were not clearly articulated in past Title IX regulations or law. ROA.4920, 4923 (¶¶ 20, 28). As a result, ABB currently must expend "more time and other resources to counsel student callers." ROA.4925 (¶ 35).

Consider, for example, a student who called ABB after the Rule was vacated nationwide. *See* ROA.4919-21 (¶¶ 19, 23). Her school had denied her request to reschedule an exam that was scheduled for her due date, forcing her to take a leave of absence. ROA.4919-20 (¶ 19). "If the regulations had not been vacated, [ABB] could have quickly assisted her" by "point[ing] her to the part of the [Rule] that defines an adjusted exam date as a reasonable accommodation." ROA.4921 (¶ 23); *see* 34 C.F.R. § 106.40(b)(3)(ii). "Instead, [ABB] ha[s] had to expend hours of additional staff time to try to come up with arguments to help her rectify the discrimination she has experienced and re-enroll in school … ." ROA.4921 (¶ 23).

ABB must also assist students through back-and-forth communications with their schools that would be unnecessary with the

clarity of the Rule. ROA.4918-21, 4923 (¶¶ 15, 21, 28). For example, at the time of its motion to intervene, ABB was trying to help an Indiana student convince her high school to provide her with space to pump. ROA.4923-24 (¶ 30). The Rule would have unambiguously entitled the student to this accommodation. 34 C.F.R. § 106.40(b)(3)(v) (2024). Without the Rule, however, her school took the position that Title IX does not include a right to a lactation space. ROA.4923-24 (¶ 30). As a result, ABB has had to spend significant time assisting the student in trying to convince her school otherwise. *Id.*

Moreover, without the Rule, ABB must spend resources to provide students basic information about Title IX and Title IX coordinators. ROA.4924-25 (¶¶ 31-34). ABB must supply this information because it fields calls from students who do not know about the protections Title IX offers them or who to contact at school for support. ROA.4924-25 (¶¶ 31-33). If the Rule were in effect, it would require schools to provide that information themselves once students disclosed their pregnancies. ROA.4925 (¶ 34); 34 C.F.R. § 106.40(b)(2) (2024).

Despite the extensive resources ABB invests in assisting their student-callers absent the Rule, ABB achieves worse results than it

would if the Rule were in place. *E.g.,* ROA.4921-26 (¶¶ 23, 26-27, 30, 36). At the time of its declaration, ABB had not been able to secure a lactation space for the Indiana student who was denied space to pump because, post-vacatur, ABB could not point her high school to the Rule's unambiguous right to that space, and the school continued to deny she had that right. ROA.4923-24 (¶ 30). And ABB had been unable to help the student who was forced to take leave because of her school's refusal to reschedule the exam set for her due date. *See* ROA.4919-21 (¶¶ 19, 23). Because ABB cannot rely on the Rule's explicit directive requiring reasonable modifications, including adjusted exam dates, ABB has been unable to convince her school to rectify the discrimination and allow her to re-enroll without penalty. ROA.4919-21 (¶¶ 19, 23). As a result, the Rule's vacatur frustrates ABB's ability to achieve its mission to protect the rights of pregnant and parenting students through its counseling service. ROA.4915, 4925-26 (¶¶ 2, 36-37).

Finally, because ABB's helpline assistance to students requires more time and other staff resources because of the Rule's vacatur, it must divert resources away from other actions it would otherwise take to pursue its mission. ROA.4925 (¶ 35). For example, "[i]f the [Rule] went

into effect," ABB "could provide full representation (including drafting demand letters, engaging in pre-suit negotiations, and filing administrative complaints and lawsuits) to more callers, rather than only providing them legal information so they can advocate for themselves." *Id.* Due to the vacatur, however, ABB cannot take on those representations. *Id.* And because so many of its calls now require much more staff time due to the vacatur, ABB cannot assist as many callers as it would if the Rule were still in place. *Id.*

This impairment of ABB's direct counseling services is an injury-in-fact. ABB's injury here is just like the one in *Havens Realty Corp. v. Coleman*, where the defendant's conduct also "frustrated" a nonprofit's "efforts to assist equal access to housing through counseling and other referral services" for home-seekers. 455 U.S. 363, 379-80 (1982). The defendants there illegally steered Black tenants away from their housing units. *Id.* at 366 n.1. The plaintiff thus had to "devote significant resources to identify and counteract" those steering practices, resources it could have used to serve more clients. *Id.* at 379. As a result, the defendant's actions "perceptibly impaired" its direct services and "drain[ed] … the organization's resources." *Id.* This, the Court held, was

24

"concrete and demonstrable injury" beyond a mere "setback to its abstract social interests." *Id.*; *see Alliance*, 602 U.S. at 395 (reaffirming that, under *Havens*, an organization that provides a counseling service is injured when conduct "interfere[s] with [its] core business activities"); *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 355 (5th Cir. 2023) ("*LaFHAC*") ("[The *Havens* plaintiff] sufficiently alleged impairment of its mission because it could assist fewer individuals."); *id.* at 356 (Ho, J., concurring) (explaining that the *Havens* plaintiff had standing because "the alleged discrimination harmed its ability to serve its clients").

Based on *Havens*, this Court has consistently held that an organization has standing to challenge actions that "'frustrate[] and complicate[]'" its "routine … activities" and thereby "reduce[] the number of people" it can assist. *LaFHAC*, 82 F.4th at 354-55 (quoting *OCA-Greater Houston*, 867 F.3d at 610); *see Vote.Org v. Callanen*, 89 F.4th 459, 470-71 (5th Cir. 2023) (holding organization was injured when, due to the challenged rule, it had to "divert[] its limited resources to less effective (and less efficient) means of increasing turnout and political engagement," such that the rule "impaired the organization's 'ability to

reach voters' and 'to get people … to participate in elections'"); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 (5th Cir. 1999) ("*ACORN*") (holding organization was injured because it "expended resources registering voters" who "would have already been registered" if the defendant had complied with the law).

In *OCA-Greater Houston v. Texas*, for example, an organization dedicated to "protecting and advancing the [voting] rights of Chinese Americans and Asian Pacific Americans" had standing to challenge a state law that restricted voters' use of interpreters at the polls because the law "frustrate[d] and complicate[d]" the organization's "routine community outreach activities." 867 F.3d at 609-10. "[T]o mitigate [the law's] real-world impact on [the organization's] members and the public," the organization had to spend extra time and effort explaining the law's requirements so that voters knew how to access interpreters at the polls. *Id.* at 612. Because it had to "spend more time explaining the law in each conversation," and could "'reach fewer people in the same amount of time,'" the Court held that the law "at issue perceptibly impaired OCA's ability' to achieve its mission of getting out the vote." *LaFHAC*, 82 F.4th at 354 (quoting *OCA-Greater Houston*, 867 F.3d at 612) (citation

modified); *see also Nairne*, 151 F.4th at 682 (reaffirming *OCA-Greater Houston* in August 2025).

So, too, ABB: Since the pregnancy-related parts of the Rule have been vacated, ABB must engage in "in-depth conversations" and research that "take more time" to assist callers than it would absent that vacatur. *OCA-Greater Houston*, 867 F.3d at 610. As a result, ABB is able to assist "fewer people," at less depth, "in the same amount of time." *Id.*

2. Because the vacatur frustrates the direct services ABB provides and limits their impact and reach, this case differs from *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and cases like it, where the plaintiffs' only claimed injury stemmed from their unconstrained voluntary choice to advocate against the government's actions.

2a. In *Alliance*, unlike in this case, the plaintiff advocacy groups did not assert that the challenged action—the FDA's decision to approve a drug—"imposed any similar impediment to [their] … advocacy business[]." 602 U.S. at 395. Instead, their only asserted injuries were the "costs" they incurred "to oppose FDA's actions" by drafting "petitions" and "engaging in public advocacy and education" to share their views. *Id.* at 394. The Court held those lobbying efforts were not enough, explaining

27

that an organization cannot "manufacture its own standing" "by expending money to gather information and advocate against the defendant's action." *Id.* If money spent to oppose the challenged actions could create standing, a plaintiff could easily convert their policy objections into a key to the courthouse doors. *See id.* at 394-95.

In contrasting that voluntary advocacy with *Havens*, "*Alliance* reaffirmed *Havens*, explaining that organizations may establish standing when a defendant's conduct directly interferes with their 'core business activities.'" *Nairne*, 151 F.4th at 682 (quoting *Alliance*, 602 U.S. at 395). According to the Supreme Court, the "[c]ritical" fact in *Havens*— distinguishing it from an organization's attempt to "manufacture its own standing"—was that the plaintiff there "not only was an issue-advocacy organization, but also operated a housing counseling service" with which the defendant's conduct interfered. *Alliance*, 602 U.S. at 394-95.

2b. *Alliance* did not disturb the wall of precedent that supports ABB's standing. *See supra* pp. 19-20, 24-27; *see also Matter of Highland Cap. Mgmt., L.P.*, 74 F.4th 361, 368 & n.28 (5th Cir. 2023) (explaining that a Supreme Court decision does not upset Fifth Circuit law unless the decision "*unequivocally* overrule[s]" and is "irreconcilable with" Fifth

Circuit precedent). This Court's pre-*Alliance* precedent already distinguished between a true impediment to an organization's pre-existing direct services, which confers standing, and voluntary issue advocacy like the lobbying in *Alliance*, which does not. In *OCA-Greater Houston*, for example, the Court distinguished a civil rights organization's diversion of resources, necessary to counsel voters about how to avoid the challenged law's "negative effects," from the efforts of a "lobbying group" that merely diverted resources to research and lobby against a law it disliked. 867 F.3d at 610-12. Unlike the lobbyists, the civil rights organization had standing because its extra counseling was necessary to "mitigate [the law's] real-world impact" on the people it served. *Id.* at 612; *see LaFHAC*, 82 F.4th at 357 (Ho, J., concurring) (explaining that "the mere voluntary diversion of resources" was not enough, but "if a defendant's practices make it more difficult or costly for an organization to conduct its operations," it "may well have standing").

And this Court has continued to apply that precedent post-*Alliance*. In *Nairne*, for example, this Court applied *OCA-Greater-Houston* to hold that two advocacy organizations, whose mission was "to advanc[e] Black political participation," had standing to challenge new voting maps that

diluted Black votes. 151 F.4th at 682. To mitigate the effects of the new maps on Black political participation, the organizations had to divert resources to "convinc[e] Black voters that their votes still mattered" and to counteract the laws' harmful effects on potential candidates and funders. *Id.* at 681. The Court held this satisfied *Havens*, as "reaffirmed" in *Alliance*: In forcing the organizations to divert resources to counteract the laws' effects, the challenged laws "interfered directly" with the plaintiffs' "core operations." *Id.* at 682. That outcome did not conflict with *Alliance* because "[t]he organizations did not simply expend[] money to express disagreement" with the maps. *Id.* (quoting *Alliance*, 602 U.S. at 394.

In *Deep South Center for Environmental Justice v. EPA*, for contrast, the Court held the plaintiff environmental advocacy organization, Deep South, lacked standing because there was no such impairment. 138 F.4th 310, 319-20 (5th Cir. 2025). Deep South challenged the EPA's decision to give a state primary regulatory authority over the state's drinking wells. *See id.* at 316. The organization alleged that the EPA's decision harmed the organization's "mission" because the state would not protect the environment as well as the EPA

would, and, as a result, Deep South would divert resources to "act as a watchdog" and "advocate against" permits issued under the new arrangement. *Id.* at 319-20. But the challenged action "place[d] no obstacles to Deep South's 'core business activities.'" *Id.* at 319 (quoting *Alliance*, 602 U.S. at 395). Unlike ABB, Deep South engaged only in issue advocacy and did not provide direct services to people. *See id.* And the EPA's decision "neither prevent[ed] Deep South from engaging in its advocacy, education, and training activities nor compel[ed] it to take any action." *Id.* As in *Alliance*, the plaintiff's claimed injury flowed from its own "voluntar[y] cho[ice] to engage in different types of education and advocacy in response to" EPA's rule. *Id.* at 320. "In short," Deep South's standing theory was an impermissible attempt to "manufacture its own standing." *Id.* (quoting *Alliance*, 602 U.S. at 394).[1]

---

[1] *Deep South* wrote, wrongly, that *Alliance* "limited *Havens* to its facts" such that "*Havens* does not support standing where 'an organization diverts its resources in response to a defendant's actions.'" 138 F.4th at 319 (quoting *Alliance*, 602 U.S. at 395). That language was dicta, because it was "unnecessary to the decision in the case," *In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004): The plaintiff's resource diversion was an attempt to "manufacture its own standing" through voluntary issue advocacy, so outside the bounds of *Havens*. *Deep South*, 138 F.4th at 320 (quoting *Alliance*, 602 U.S. at 394). And *Nairne* more recently held that a plaintiff's diversion of resources still supports standing in the

Unlike the plaintiffs in *Alliance* and *Deep South*, ABB does not claim that it suffered an injury because it voluntarily chose to engage in public advocacy work to oppose the defendants' actions or the judgment below. It does not, for example, base its standing on public advocacy for laws more protective of pregnant students. Instead, as in *Havens* and *Nairne*, the vacatur has "directly interfere[d]" with ABB's counseling services, which still gives "rise to a cognizable injury." *Nairne*, 151 F.4th at 682. ABB cannot avoid the vacatur's impact on its counseling services. Callers come to ABB, not the other way around. And when they do, ABB *must* spend more time with each caller to give them professionally competent advice. ROA.4925 (¶ 35). No matter what ABB does, the vacatur "compels" ABB to adjust its direct services and "prevents" it from representing many students. *Deep South*, 138 F.4th at 319-20.

---

circumstance addressed in *Havens*: when the defendants' actions "perceptibly impair[]" the organization's core functions. *Nairne*, 151 F.4th at 682. If there were any doubt about the scope of *Deep South*'s holding, *Nairne* would resolve it. *See Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172, 182 (5th Cir. 2020) (Ho, J., concurring) (noting that a subsequent decision may "narrow[] … a holding that … was too broadly phrased" based on "material differences" in facts (citation modified)).

3. The same features distinguish this case from *LaFHAC v. Azalea Garden Properties, L.L.C.*, on which the district court relied. Unlike here, the plaintiff did not allege that the challenged conduct "made it more difficult to conduct its operations." 82 F.4th at 357-58 (Ho, J., concurring). Instead, like the plaintiffs in *Alliance*, the Louisiana Fair Housing Action Center (LaFHAC) claimed it diverted resources to investigate and educate the public about the defendants' discrimination. *See id.* at 351-53 (majority). In rejecting that theory of standing, this Court "simply" held that an organization's choice to "'divert[]' resources from one core mission activity to another," standing alone, was not a cognizable injury. *Id.* at 355. In doing so, the Court reiterated the rule from *Havens* and *OCR-Greater Houston*: The organization *would* have had standing if the defendant's actions had "'frustrate[d] and complicate[d]'" its "'routine … activities'" and thereby "reduced the number of people" it could assist. *Id.* at 354-55 (quoting *OCA-Greater Houston*, 867 F.3d at 610). The critical difference between *LaFHAC* (on one hand) and *OCA-Greater Houston* and *Havens* (on the other), then, was that LaFHAC "ha[d] not plausibly alleged that its diversion of resources meant it could reach fewer people"

or "assist fewer individuals." *Id.* at 354-55. ABB, in contrast, has shown just that. *See supra* pp. 20-24.

Anticipating *Alliance*, Judge Ho's concurrence stressed that LaFHAC's claimed injury was a "self-inflicted" one: It was, as in *Alliance*, a "voluntary diversion of resources" to oppose the defendant's conduct. 82 F.4th at 356-57 (Ho, concurring). The organization alleged that the defendant "negatively impacted the causes [the plaintiff] believes in, and that in response, [the organization] *chose* to expend resources to counteract those negative social effects." *Id.* at 357 (emphasis added). The plaintiff could have avoided the injury by simply doing "nothing." *Id.* That set *LaFHAC* apart from *Havens*, where the defendant's conduct unavoidably "harmed [the plaintiff's] ability to serve its clients." *Id.* at 356. And it separates *LaFHAC* from this case for the same reason.

In holding that ABB lacked standing, the district court focused on one line from *LaFHAC*, which said that an organization's "injurious counteractions must *differ* from its routine activities" to constitute an injury-in-fact. ROA.5544 (citation modified) (quoting *LaFHAC*, 82 F.4th at 351). But that is just another way of saying an organization does not have a *Havens*-style injury if its "daily operations" would remain the

same—rather than become more time or labor intensive, for example—absent the challenged conduct. *OCA-Greater*, 867 F.3d at 611-12. The organization's response must "consume[] its time and resources in a way they would not have been spent" otherwise. *Id.* at 612.

In *LaFHAC*, for example, the Court held that the plaintiff, which routinely conducted investigations into discrimination, did not have standing just because it chose to investigate the defendant's discrimination. 82 F.4th at 352. If the defendant had obeyed the law, the plaintiff would have just investigated something else. *See id.* So the Court could not conclude that LaFHAC would have saved any time, or served more people, absent the challenged conduct. *See id.* By contrast, if the challenged acts make the plaintiff's operations "more difficult or costly," it "may well have standing." *Id.* at 357 (Ho, J. concurring). That is the case here: Absent the vacatur, ABB would save significant time and resources, and it could use them to serve more people in more effective ways. *See supra* pp. 20-24.

The district court read *LaFHAC*'s "routine activities" language to add a new requirement for standing. As the district court saw it, an entity suffers no injury as long as it diverts resources to the same *type* of

activities it normally performs, even if those core activities become more difficult and help fewer people. *See* ROA.5544-46. To have standing, the district court suggested, an organization must devote resources to "non-routine activities." ROA.5549. Based on that interpretation of *LaFHAC*, the district court held that ABB was not injured because the activities to which it diverted resources—like counseling students and workers— were the same class of activities that ABB normally performs, and they furthered ABB's mission. ROA.5544-46.

The district court's "non-routine activities" requirement conflicts with this Court's precedent. As *LaFHAC* itself reiterated, the organization in *OCA-Greater Houston* had standing because the defendants' actions "'frustrate[d] and complicate[d]'" its "'*routine* community outreach activities'" by forcing it to "spend more time explaining the law" to voters, not because it diverted resources to any new initiatives. *LaFHAC*, 82 F.4th at 354 (quoting *OCA-Greater Houston*, 867 F.3d at 610) (emphasis added). Likewise, the organization in *ACORN v. Fowler* had standing based on its diversion of resources, even though that diversion was into voter registration drives, which it routinely conducted. 178 F.3d at 360-61. That these plaintiffs diverted their

resources to routine activities that "furthered [their] mission[s]" did not defeat standing. ROA.5545 (citation modified).

4. The district court also concluded that ABB lacked standing because it is "still able to provide legal services and advocate for [its] clients in the absence of the Final Rule." ROA.5551. But as this Court has recognized, both before and after *Alliance*, an entity's core activities need not grind to a halt before it can sue: The plaintiff need only show that a core activity was "perceptibly impaired." *Nairne*, 151 F.4th at 682 (quoting *Havens*, 455 U.S. at 379) (finding standing even though the organizations did not stop any core activity); *accord LaFHAC*, 82 F.4th at 357 (Ho, J., concurring) (explaining that the plaintiff need only show its operations became "more difficult"). After all, the plaintiff in *Havens* did not allege it stopped counseling or referring clients, but instead that the defendants' actions "frustrated" those tasks. 455 U.S. at 369, 379. The district court thus erred in holding ABB did not suffer an injury.

### 2. ABB has established causation and redressability.

ABB also satisfies the remaining Article III standing requirements. ABB's injury is fairly traceable to the vacatur of the Rule's provisions that grant protections to pregnant and postpartum students. *See supra*

pp._20-24. And this injury would likely be redressed by a favorable decision from this Court, since such a decision would undo the district court's vacatur of the relevant provisions. *See Alliance*, 602 U.S. at 381 (explaining that a party can generally establish redressability if it can establish causation).

**B. ABB has standing based on its procedural injury.**

ABB also has standing for another reason. "A plaintiff can show a cognizable injury if it has been deprived of a procedural right to protect its concrete interests." *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 503 (5th Cir. 2024). Here, the combination of the vacatur and the Government's subsequent collusive litigation tactics are denying ABB procedural rights to participate in the regulatory process—rights that ABB could have exercised to protect their interest in the resources the pregnancy provision would allow them to preserve.

Under the APA, a federal regulation adopted through notice-and-comment rulemaking can be rescinded only through notice-and-comment rulemaking. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). As part of that process, affected parties have the right to submit input on the proposed recission, 5 U.S.C. § 553(c), and to seek judicial review of

the final outcome, *see Dep't of Com. v. New York*, 588 U.S. 752, 773-76 (2019).

In this case, however, the Government, whose new leadership disagrees with parts of the Rule, has used the district court's vacatur to circumvent that critical process. *See*, *e.g.*, U.S. Dep't of Educ., Dear Colleague Letter 1-2 (Jan. 31, 2025), https://perma.cc/FEQ5-93Q4 ("Jan. 2025 DCL"). When a new administration inherits a regulation it does not support and which is subject to ongoing litigation, it usually asks the court to hold that litigation in abeyance while the agency pursues the proper administrative process to repeal the rule. *See* Bethany A. Davis Noll & Richard L. Revesz, *Regulation in Transition*, 104 Minn. L. Rev. 1, 8-9, 28 (2019); Peter Fox & Connor Raso, *What a Biden Administration Should Learn from the Trump Administration's Regulatory Reversals*, Brookings (Sept. 28, 2020), https://perma.cc/G8DP-FLCG.

Here, instead, the Government engaged in "rulemaking-by-collusive-acquiescence." *Arizona v. City & Cnty. of S.F.*, 596 U.S. 763, 766 (2022) (Roberts, J., concurring, joined by Thomas, Alito, & Gorsuch, JJ.) (quoting *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 992 F.3d 742, 744 (9th Cir. 2021) (VanDyke, J., dissenting)) (criticizing Biden

administration's similar conduct). Rather than bother with the APA's procedures, the government "seized upon … [the] judgments against it" and "opposed efforts by other interested parties," including ABB, "to carry on the defense of the Rule." *Id.* at 765-66; *see supra* pp. 14-15. As a result, if the vacatur remains in place, the Government will have gotten rid of the Rule without notice and comment, and ABB will lose its opportunity to be heard.

The district court did not deny that the Government's litigation tactics denied ABB procedural rights. *See* ROA.5551-52. Instead, it held that ABB had not shown that procedural deprivation threatened any "concrete interest" because the vacatur's effect on ABB's activities did not satisfy the *Havens* test. *Id.* In doing so, the court overlooked that when the challenged action deprives a plaintiff of a procedural right, the "the concrete interest analysis is subject to a looser standard" than would apply to a traditional Article III injury. *Becerra*, 116 F.4th at 503. So ABB "could demonstrate a concrete interest" protected by the APA "even if its [*Havens*] theory failed." *Id.*

Here, the notice-and-comment process would protect ABB's concrete interest in preserving the resources it must expend absent the

Rule's pregnancy provision. *See supra* pp. 20-24; *see Becerra*, 116 F.4th at 503 (holding that the notice-and-comment process protected association's concrete interest in avoiding revenue losses caused by the challenged regulation). It would give ABB "fair warning of potential changes in the law and an opportunity to be heard on those changes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019). And it would "afford[] the agency a chance to avoid errors and make a more informed decision" that could spare ABB the losses it would suffer without the updated pregnancy provision in place. *Id.*

Because the vacatur deprives ABB of a procedural right that protects its concrete interests, it need not "meet[] all the normal standards for redressability and immediacy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *accord Becerra*, 116 F.4th at 504.

Here, there is at least a possibility that the government would not rescind the pregnancy-related provisions of the Rule if it followed the

41

APA's normal procedures. Although Defendants have criticized other parts of the Rule, especially those regarding transgender students' rights, they have never, to ABB's knowledge, objected to the provisions protecting pregnant and postpartum students, even in opposing ABB's intervention below. *See*, *e.g.*, Jan. 2025 DCL at 1-2 (criticizing the Rule on other grounds). As a result, ABB has standing.

## II.    This Court should permit A Better Balance to intervene

### A. A Better Balance is entitled to intervene

"A ruling denying intervention of right is reviewed *de novo*." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc). Proposed intervenors are entitled to mandatory intervention under Rule 24(a)(2) if they meet each of four factors: (1) the application to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the case; (3) absent intervention, the outcome of the case may impair the proposed intervenor's ability to protect that interest; and (4) the proposed intervenor's interest will not be adequately represented by the existing parties. *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) ("*Texas I*"). A non-party may intervene "for the purpose of appeal." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395 (1977).

The Rule 24(a)(2) inquiry "is a flexible one, which focuses on the particular facts and circumstances surrounding each application," meaning that "intervention of right must be measured by a practical rather than technical yardstick." *Edwards*, 78 F.3d at 999 (citation omitted)). "Rule 24 is to be liberally construed." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). "Federal courts should allow intervention where no one would be hurt and the greater justice could be attained." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th Cir. 2022) (citation modified).

Because ABB satisfies the four intervention factors, it is entitled to mandatory intervention in this action. Below, the Government advanced no argument to the contrary. ROA.5294-5301. And Carroll only argued ABB could not meet the first two factors: timeliness and a substantial legal interest in the case. ROA.5404-11. ABB meets both.

### 1. ABB's motion is timely

Whether a motion to intervene is timely is "contextual; absolute measures of timeliness should be ignored." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). In evaluating timeliness, this Court considers four factors: (1) "[t]he length of time during which the would-be

intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene," (2) prejudice caused by the would-be intervenor's delay, if any, in moving, (3) prejudice to the movant if intervention is denied; and (4) any "unusual circumstances." *Id.*

"A common example of post-judgment intervention that satisfies these criteria is intervention for the purpose of appealing a decision that the existing parties to a suit have decided not to pursue." *Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005); *see McDonald*, 432 U.S. at 391-96 (explaining a motion to intervene is generally timely when the movant seeks to intervene for purposes of appealing and the motion is filed before the deadline to notice an appeal). Unsurprisingly, then, all four timeliness factors cut in ABB's favor.

*First*, ABB moved quickly to file its motion nearly a month before the April 21, 2025, deadline to notice an appeal. *See* Fed. R. App. P. 4(a)(1)(B). And ABB did so promptly after learning that the Government likely would no longer adequately represent ABB's interests—most definitively, when the Government declined to notice an appeal by the March 10, 2025, deadline in another case vacating the Rule. *See supra*

44

pp. 14-15. The time it took ABB to prepare its motion is well within what this Court has allowed other intervenors. *See, e.g., In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 250 (5th Cir. 2009) (two years); *Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318, 321 (5th Cir. 1986) (five months)*; Edwards*, 78 F.3d at 1000 (forty-seven days).

Below, Carroll said that ABB should have moved to intervene in the summer of 2024, shortly after Carroll filed its lawsuit. ROA.5404-09. But that motion would have been premature. Back then, ABB could not have shown, as required by Rule 24(a)(2), that its interest was inadequately represented by the existing parties to the suit. At that stage, the Government defended the Rule. *See supra* p. 15. In doing so, the Government demonstrated it shared ABB's "ultimate objective" in this case and thus was an adequate representative. *Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1288 (5th Cir. 1987). Once the Government and ABB's interests diverged, ABB moved swiftly to intervene.

In another filing below, Carroll acknowledged that ABB and other proposed intervenors may not have known "about the threat to their interests" until "shortly after this Court vacated the Rule" on February

45

19. ROA.5237. At that time, according to its own court filings, the Government was still considering defending the Rule on appeal. *See supra* p. 15. Regardless, if Carroll were right and the vacatur started the clock, the month ABB took to file was fast enough to satisfy this Court's precedent. *See supra* p. 45 (collecting cases).

*Second*, the timing of ABB's intervention would not prejudice the existing parties. This factor "must be measured by [any] delay in seeking intervention, not the inconvenience to the existing parties of allowing the" intervention. *Sierra Club*, 18 F.3d at 1206. The Government, rightfully, did not argue below that it would face any prejudice, and so has forfeited any argument to that effect. ROA.5294-5301. Carroll complained but has no reason to do so. *See* ROA.5409-10. The timing of ABB's intervention means that the organization will pick up defense of the pregnancy-related provision where the Government left off. Carroll is not prejudiced because the identity of its adversary has changed after the final judgment. *See McDonald*, 432 U.S. at 394 (noting a party "can hardly contend that its ability to litigate the issue was unfairly prejudiced simply because an appeal" was brought by a post-judgment intervenor rather than an original party).

*Third*, ABB, as the prospective intervenor, would suffer substantial prejudice if intervention were denied. If ABB cannot intervene in this suit, then the Rule, including its pregnancy-related provisions, will be permanently vacated. *See Ross*, 426 F.3d at 756 (noting that putative intervenor "will suffer considerable prejudice if it is denied the opportunity to challenge this judgment on appeal").

*Fourth*, unusual circumstances militate for a determination that the intervention was timely. The district court's nationwide vacatur of the Rule stripped protections from pregnant and postpartum students, and impaired the work of organizations that support them, without considering whether the Rule was severable. And it did so just as the Government changed its position on the Rule, suddenly leaving the pregnancy provision without a defender at a critical juncture in the case. Accordingly, ABB's motion to intervene is timely.

## 2. ABB has substantial interests in part of the Rule

ABB also satisfies Rule 24(a)'s requirement that a movant for intervention must have "an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). This Court has interpreted this language as requiring a "direct, substantial,

legally protectable interest in the proceedings." *Edwards*, 78 F.3d at 1004 (citation omitted). In practice, this substantial interest analysis "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *Texas I*, 805 F.3d at 657. "The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group." *Brumfield*, 749 F.3d at 344 (quoting 6 James W. Moore et al., Moore's Federal Practice § 24.03[2][c], at 24-34 (3d ed. 2008)).

The injury that provides ABB standing is also sufficient to establish an interest to intervene under Rule 24(a). This Court has "previously suggested that 'a movant who shows standing is deemed to have a sufficiently substantial interest to intervene.'" *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 n.3 (5th Cir. 2016) (quoting *League of Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434 n.17 (5th Cir. 2011)). And an organization has a substantial interest in a law or policy change that requires it to "expend resources" to "carry out" its mission. *La Union del Pueblo Entero*, 29 F.4th at 306. In the absence of the Rule's pregnancy-related provision, ABB has

48

standing, and an interest in intervening, because it must spend more staff time and other resources to provide direct services to student-callers. ROA.4917-26 (¶¶ 6-37); *see supra* Part I.A.1.

### 3. ABB's interests will be impaired if it cannot intervene

Under Rule 24(a), ABB must also show that "disposition of the action may, as a practical matter, impair or impede [its] ability to protect [its] interest." *Texas I*, 805 F.3d at 657 (citation omitted). This is a minimal burden, requiring the movant "only [to] show that if they cannot intervene, there is a possibility that their interest could be impaired or impeded." *La Union del Pueblo Entero*, 29 F.4th at 307. This requirement is ordinarily satisfied when the case's disposition "would put the movant at a practical disadvantage in protecting its interest." 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1908.2 (3d ed. 2025).

Here, it is more than possible that ABB's interests will be impaired if the Court does not allow it to intervene. The district court has vacated the Rule in its entirety. *See* ROA.4875. The Government is no longer defending the Rule. *See supra* pp. 14-15. So, if this Court denies ABB intervention, the district court's nationwide vacatur of the Rule's

pregnancy-related protections—in which ABB has a substantial interest—will be permanent.

On this, there is no dispute. Although Carroll disagreed below that ABB's identified interests in the case were sufficient, it did not contest that they would be impaired absent intervention. *See* ROA.5410-11.

### 4. The existing parties do not adequately protect ABB's interests

Lastly, ABB can establish that its "interest[s] [are] inadequately represented by the existing parties to the suit." *Texas I*, 805 F.3d at 657. Below, no party contested that ABB can meet this factor. For good reason.

This requirement presents only a "minimal" burden. *Edwards*, 78 F.3d at 1005 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). ABB "need not show that the representation by existing parties will be, for certain, inadequate, but instead that it *may* be inadequate." *La Union del Pueblo Entero*, 29 F.4th at 307-08 (citation modified). An existing party's decision "not [to] pursue an appeal" can constitute inadequate representation. *Ross*, 426 F.3d at 761; *accord Ams. United for Separation of Church & State v. City of Grand Rapids,* 922 F.2d 303, 306 (6th Cir. 1990). Similarly, representation by existing

parties may be inadequate when those parties oppose relief sought by a prospective intervenor. *See, e.g.*, *City of Boerne*, 659 F.3d at 435.

Here, ABB can clear that minimal hurdle by a mile. The only party that ever represented ABB's interests was the Government, which previously defended the Rule. *See supra* p. 14-15. After a change in presidential administration, the Government did not appeal the district court's decision vacating the Rule. *See supra* pp. 14-15. And the Government is now attempting to ensure that provision's demise by opposing ABB's intervention. *See supra* p. 15. The interests of both the existing parties in the case are contrary to ABB's.

## B. The Court should grant A Better Balance permissive intervention

This Court reviews a "district court's denial of permissive intervention" for "an abuse of discretion." *Edwards*, 78 F.3d at 992. Here, the district court only denied ABB permissive intervention because it concluded the organization lacked standing. ROA.5543. That was wrong. *See supra* pp. 18-42. And "[a] district court by definition abuses its discretion when it makes an error of law." *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (quoting *Koon v. United States,* 518 U.S. 81,

100 (1996)); *accord Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014). This Court should permit ABB to intervene.

Permissive intervention requires proposed intervenors to establish that their motion is timely and that their "claim or defense and the main action have a question of law or fact in common." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263, 269 (5th Cir. 1977) (quoting Fed. R. Civ. P. 24(b)(2)). After these two requirements are met, a court must "exercise its discretion in deciding whether intervention should be allowed." *Id.* at 269. In making this determination, the Court should "consider, among other factors, whether the intervenors' interests are adequately represented by other parties and whether intervention will unduly delay the proceedings or prejudice existing parties." *Kneeland*, 806 F.2d at 1289 (citation omitted).

Permissive intervention for ABB is appropriate here. As discussed above, this motion is timely. *See supra* Part II.A.1. And ABB's motion identifies common questions of law or fact with the existing action. Carroll has successfully argued that the Rule should be vacated in its entirety. *See, e.g.*, ROA.1207-09. ABB's position is that the portions of the Rule the district court found were unlawful are severable from the

unchallenged pregnancy provision, so the latter should go into effect. *See infra* pp. 54-66. These positions clearly represent common questions of law, especially given this Court's "liberal[]" construction of this requirement. *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Indeed, the Government previously advanced a version of ABB's argument. *See* ROA.1750-58.

Lastly, the "other factors," *Kneeland*, 806 F.2d at 1289, that the Court may consider also favor permissive intervention. As discussed above, ABB's interests are not adequately represented by the existing parties. *See supra* pp. 50-51. And there is no undue delay and prejudice to the original parties. *See supra* p. 46. Further, the original parties "can hardly contend that [their] ability to litigate the issue was unfairly unprejudiced simply because an appeal … was brought by [an intervenor], rather than by one of the original named [defendants]." *McDonald*, 432 U.S. at 394. Accordingly, the Court should permit ABB to intervene in this suit under Rule 24(b).

**III. This Court should revive the unchallenged pregnancy provision because it is severable from the provisions the district court found unlawful**

This Court "review[s] the district court's vacatur decision for abuse of discretion." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). "Severability," however, "presents a pure question of law." *Seila L. LLC v. CFPB*, 591 U.S. 197, 233 (2020). And a district court's legal error is per se an abuse of discretion. *See supra* p. 51.

Here, "the district court erred when it vacated the entire Rule instead of severing" the handful of challenged provisions it found unlawful and allowing the unchallenged pregnancy provision to go into effect. *Texas v. United States,* 126 F.4th 392, 419 (5th Cir. 2025) ("*Texas II*"). Regulations are "presumptively severable." *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023); *accord Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 626 (2020) (describing the "presumption of severability" and the Supreme Court's "decisive preference for surgical severance rather than wholesale destruction of laws"). That presumption requires courts to sever invalid parts of a regulation from the rest of the regulation unless (1) "the agency manifests an intent for the entire package to rise or fall together" or (2) "the

54

remaining [regulations] cannot operate by themselves." *Bd. of Cnty. Comm'rs of Weld Cnty.*, 72 F.4th at 296; *accord Nat'l Ass'n of Mfrs. v. U.S. SEC*, 105 F.4th 802, 816 (5th Cir. 2024).[2]

As the party who challenged the Rule, Carroll bears the burden of overcoming the presumption of severability. *Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1560 (D.C. Cir. 1985); *see Nat'l Ass'n of Mfrs.*, 105 F.4th at 816 (severing challenged provision because party challenging regulation failed to show that it was not severable). Carroll has failed to carry that burden by either establishing that the agency intended for the Rule to be unseverable or that the pregnancy provision could not operate without the portions of the rule the district court found unlawful.

## A. The Department intended for the Rule to be severable

Severance is proper unless there is "substantial doubt" that the agency would have adopted the unchallenged portion of a rule if the challenged portion were subtracted. *Nat'l Ass'n of Mfrs.*, 105 F.4th at 816

---

[2] This Court and the Supreme Court look to law on statutory severability when assessing regulatory severability. *See, e.g., K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988); *Texas II,* 126 F.4th at 419.

(quoting *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022)). No doubt exists here.

When a regulation includes a clause that makes clear that the unconstitutionality of one provision does not affect the rest of the law—what is known as a "severability clause"—there is "no doubt" that the agency intended for the regulation to be severable. *Barr*, 591 U.S. at 624; *see Seila*, 591 U.S. at 235 (explaining there was "no need to wonder" what Congress intended because it "told us" in the severability clause). Thus, both this Court and the Supreme Court "adhere to the text of a severability clause in the absence of extraordinary circumstances." *Texas II*, 126 F.4th at 419 (quoting *Nat'l Ass'n of Mfrs.*, 105 F.4th at 815); *Barr*, 591 U.S. at 624.

Here, the Department included a severability clause in every subpart of the Rule. *See* 34 C.F.R. §§ 106.9, 106.16, 106.24, 106.48, 106.62, 106.72, 106.82 (2024). Each clause says: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." *Id.* With those express severability clauses, there is "no doubt" the Department intended

for the challenged provisions to be severable from the rest of the Rule, including § 106.40. *Barr*, 591 U.S. at 624.

Still, Carroll urged the district court to look past the severability clauses and "[i]nstead" try to discern, by other means, whether the agency "would have enacted the [R]ule absent the challenged provisions." ROA.1207. That's inconsistent with the Supreme Court's clear directive that judges should not "override the text of a severability ... clause" in search of some other expression of the lawmakers' "actual intent." *Barr*, 591 U.S. at 624; *see also Texas II*, 126 F.4th at 419 (faulting district court for "ignor[ing]" a regulation's "severability clause" and instead concluding that the agency "would not have adopted" the regulation without an unlawful provision (citation omitted)).

Regardless, even if this Court looked beyond the Rule's "plain language," the record only bolsters that the Department meant what it said in the severability clauses. *Seila L.*, 591 U.S. at 235. In the preamble to the Rule, the Department explained that each provision "serve[d] an important, related, but distinct purpose" and provided a "distinct value" that was "separate from, and in addition to, the value provided by the other provisions." 89 Fed. Reg. at 33,848. To that end, the Department

"confirm[ed] that each of the provisions" were "intended to operate independently of each other and that the potential invalidity of one provision should not affect other provisions." *Id.* The Department explained that it "include[d] this [preamble] discussion to remove any 'doubt that [it] would have adopted the remaining provisions of the Final Rule' without any of the other provisions." *Id.* (quoting *Mayor of Balt. v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (en banc)).

### B. The unchallenged pregnancy regulations operate independently of the provisions held unlawful—and any other part of the Rule

1. The pregnancy provision also satisfies the second severability prong: It is "'capable of functioning independently'" from the provisions the district court found unlawful "and thus would be 'fully operative' as a law" if revived. *Barr*, 591 U.S. at 628 (quoting *Seila L.*, 591 U.S. at 235). When unlawful provisions are "legally distinct and can be decoupled" from the unchallenged provisions, the remaining provisions must survive. *Texas II*, 126 F.4th at 420 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 590 U.S. 1, 30 (2020)). It is "unusual" for the remaining law to be inoperative. *Barr*, 591 U.S. at 628.

Title IX's pregnancy regulations operated for nearly fifty years before the Rule, and still operate today, in their previous form, post-vacatur. *See supra* pp. 6-8. As the Supreme Court recently noted, it is "difficult to imagine a more compelling case for severability" than when an unchallenged law functioned independently for decades before the addition of unlawful amendments. *Barr*, 591 U.S. at 631 (quoting *United States v. Jackson*, 390 U.S. 570, 589 (1968)).

And none of the Rule's updates to § 106.40 render the provision dependent on the provisions found unlawful. For example, § 106.40(b)(3)(ii) (2024) newly provides postpartum students the right to take breaks during class to express breast milk. That regulation can function no matter the definition of "hostile environment," 34 C.F.R. § 106.2 (2024), without the de-minimis harm rule, *id.* § 106.31(a)(2), and regardless of whether sex discrimination includes discrimination based on "gender identity," *id.* § 106.10.

Of course, it is not ABB's burden to convince this Court that the pregnancy provision can operate independently. It is Carroll's responsibility to show that it cannot. *Supra* p. 55. Below, Carroll asserted that vacating parts of the Rule related to gender-identity would "impair[]

59

the function of the Rule as a whole." ROA.1208. But it did not say how. And it did not mention the pregnancy regulations at all.

Carroll also offered no evidence for its assertion that the challenged provisions are "at the heart of" the Rule. *Id* (quoting *Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *1 (5th Cir. 2024), *aff'd*, 603 U.S. 866 (2024)). And even if that were true, whether an unlawful provision is at "'the heart of'" a law "says nothing about whether" the rest of the law could function without it. *Texas II*, 126 F.4th at 420 (quoting *Regents*, 591 U.S. at 28, 30). So, for example, it was legal error for a district court to conclude that, because Deferred Action for Childhood Arrivals ("DACA") was "primarily a benefits rule," and because DACA's core benefits provision was unlawful, another part of DACA, unrelated to benefits, could not "function sensibly." *Id.* (citation omitted). So too here: Even if the provisions the district court held unlawful were the Rule's "heart," ROA.1208, that would say nothing about whether the pregnancy provision could function independently.

Given that the pregnancy provision can operate independently of the provisions found unlawful, and given the agency's clear intent for the Rule to be severable, there is no reason for this Court to depart from the

"strong presumption of severability." *Barr*, 591 U.S. at 625. This Court should revive the pregnancy provision.

2. The 2024 version of § 106.40 can operate without this Court reviving any other provision of the Rule. The updated § 106.40 can simply replace the old § 106.40 while the rest of the Title IX regulations remain as they did before the Rule.

Pregnancy does also come up in the new § 106.2, a long list of definitions. *See* 34 C.F.R. § 106.2 (2024). The Rule updated § 106.2 by revising some previous definitions and adding other terms, including "pregnancy and related conditions." *Id*. The previous version of § 106.2—operative today, post-vacatur—does not include a definition of that phrase. *See* 34 C.F.R. § 106.2 (1980). Section 106.40 does not need a definition of "pregnancy and related conditions" to function, as the history of pregnancy discrimination law demonstrates. But, if the Court disagrees, it can and should revive the updated § 106.2.

2a. Section 106.40 is "capable of functioning" without a definition of "pregnancy and related conditions." *Barr*, 591 U.S. at 630. Not every word in every regulation requires explanation. *See, e.g.*, *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) (noting

that agencies are not "required to define" every "term" in a regulation (quoting *Pearson v. Shalala*, 164 F.3d 650, 661 (D.C. Cir. 1999)); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 975 (5th Cir. 2023) (same, for proposed rules). The agency, regulated parties, and courts can interpret "pregnancy and related conditions" in § 106.40 based on its plain meaning. *See Belt v. EmCare, Inc.*, 444 F.3d 403, 409 (5th Cir. 2006) ("[B]ecause the regulations do not define the terms used … we must consider the words' ordinary meaning.").

Consider the Pregnancy Discrimination Act of 1978 (PDA), which prohibited employment discrimination based on "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The law did not define "pregnancy" or "related … conditions." *See id*. Yet courts, and the enforcing agency, have been able to interpret those terms. *See, e.g., Saks v. Franklin Covey Co.*, 316 F.3d 337, 345-46 (2d Cir. 2003) (interpreting scope of "[pregnancy-]related medical condition" in the PDA); *Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997) (same); EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues*, Part I.A.4 (June 25, 2015), https://perma.cc/83KG-7SGZ (providing examples of related conditions to which the PDA may apply).

2b. What if this Court disagrees with ABB and believes the 2024 version of § 106.40 needs the 2024 version of § 106.2's definition of "pregnancy and related conditions" to operate, but declines another putative intervenor's invitation to revive the new § 106.2 in full? Then the Court should restore the 2024 version of § 106.2 while excising the definition of "sex-based harassment."

As to the new § 106.2, the district court only found unlawful the definition of "hostile environment harassment," which is part of a definition of "sex-based harassment." ROA.4872. The definition of sex-based harassment is severable. The Government intended for it to be, *see supra* Part II.A, and Title IX's regulatory scheme functions well without it. No other piece of § 106.2 relies on, or even mentions, the sex-based harassment definition. *See* 34 C.F.R. § 106.2 (2024). And the 2024 version of § 106.2—minus that one excision—fits with the rest of Title IX's operative regulatory scheme. The updated § 106.2 provides definitions of all the terms defined in the older version of § 106.2 save one, which relates to portions of the regulations that have been inoperative for decades. *See* 89 Fed. Reg. at 33,833-34 (explaining why the Rule removed

that definition).[3] That near-perfect match holds even without the new sex-based harassment definition because the previous iteration of § 106.2 did not define the term. *See* 34 C.F.R. § 106.2 (2020).[4]

3. ABB's interest is in the pregnancy provision. If, however, the Court believes that the best way to revive that is to sever the provisions held unlawful and to restore everything else, it can and should do so because the rest of the Rule can function independently of those provisions. For the same reasons Carroll has failed to carry its burden that the pregnancy provision cannot function without the provisions the district court found unlawful, it has failed to demonstrate that the rest of the Rule cannot either. *See supra* pp. 58-61.

## C. Earlier rulings in *Louisiana* are not to the contrary

This Court's and the Supreme Court's previous decisions about the Rule do not require a different outcome. In a non-binding 2024 decision,

---

[3] The term that the new version does not define is "transition plans." *Compare* 34 C.F.R § 106.2 (2020) *with* 34 C.F.R § 106.2 (2024). It is used in two provisions that applied, until 1979, to schools transitioning to co-education. *See* 34 C.F.R. §§ 106.16, 106.17 (1980).

[4] Reviving the new § 106.2 without the "sex-based harassment" definition would not pose a problem for the operative harassment regulations. Those separately define "sexual harassment." 34 C.F.R. § 106.30 (2020).

this Court declined to grant a partial stay pending appeal of a Louisiana district court's preliminary injunction of the Rule. *See Louisiana*, 2024 WL 3452887, at *1-2. The federal government had requested that, while an appeal of that injunction moved forward, this Court narrow the injunction to the provisions challenged in that lawsuit. *Id.* at *1. This Court declined because the government had failed, below, to "adequately identif[y]" or brief "the possibility of a partial preliminary injunction." *Id.* This Court also reasoned that it may have been appropriate for the district court to preliminarily enjoin the full Rule even if narrower relief would be appropriate after final judgment. *See id.* at *2. That non-binding reasoning is inapplicable to this appeal, which arises from a final judgment after briefing about the Rule's severability.

The same goes for the Supreme Court's subsequent denial of the same emergency relief. *See Dep't of Educ. v. Louisiana*, 603 U.S. 866, 866-68 (2024). The challenger of a regulation ordinarily carries the burden to show the rule is not severable. *Supra* p. 55. But on its emergency application for a stay in *Louisiana*, the government had the burden to demonstrate "a likelihood of success on its severability argument." 603 U.S. at 686. The Court held that the government had failed to carry its

burden to "adequately identif[y] which particular provisions" could function independently of the challenged provisions and to otherwise demonstrate severability. *Id.*

The Supreme Court's "stay order" was not a binding "ruling on the merits." *Merrill v. Milligan*, 142 S.Ct. 879, 879 (2022) (Kavanaugh, J., concurring). And its reasoning is inapplicable to this appeal, which arises on a different posture with different briefing, and where Carroll, not ABB, bears the burden to convince the Court. Carroll cannot do so because the Department intended for the Rule to be severable, and the pregnancy provision can function independently.

## CONCLUSION

The Court should reverse the final judgment as to 34 C.F.R. § 106.40.

December 15, 2025

Respectfully submitted,

/s/ *Alexandra Z. Brodsky*
Alexandra Z. Brodsky
Sean Ouellette
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
souellette@publicjustice.net
akimmel@publicjustice.net

Leila Nasrolahi
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lnasrolahi@publicjustice.net

Marissa Benavides
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
(646) 876-5766
benavides@braunhagey.com

Matthew Borden
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
(415)-599-0210
borden@braunhagey.com

*Counsel for Movant-Appellant
A Better Balance*

67

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this opening brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on December 15, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Alexandra Z. Brodsky*
Alexandra Z. Brodsky

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(7)(A) because it contains 12,983 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32.2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32.1 and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

Dated: December 15, 2025          */s/ Alexandra Z. Brodsky*
Alexandra Z. Brodsky
*Counsel for Movant-Appellant*
*A Better Balance*