# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

### CARROLL INDEPENDENT SCHOOL DISTRICT,
Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, Secretary, U.S. Department of Education; KIMBERLY RICHEY, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, U.S. ATTORNEY GENERAL; HARMEET DHILLON, in her official capacity as Assistant Attorney General for the Civil Rights Division of the United States Department of Justice,
Defendants-Appellees.

### VICTIM RIGHTS LAW CENTER; JANE DOE; A BETTER BALANCE,
Movants-Appellants

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## BRIEF FOR FEDERAL DEFENDANTS-APPELLEES

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

RYAN RAYBOULD
  *United States Attorney*

CHARLES W. SCARBOROUGH
STEVEN A. MYERS
DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision should be affirmed under controlling Supreme Court and Circuit precedent. Although the United States does not believe that oral argument is necessary, it stands ready to present argument if the Court would find it useful.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ....................................................................3

STATEMENT OF THE ISSUE.............................................................................4

STATEMENT OF THE CASE...............................................................................4

    A.    Title IX And The Rule ....................................................................4

    B.    Litigation Concerning The Rule ...................................................6

    C.    Post-Judgment Proceedings In This Case....................................8

SUMMARY OF ARGUMENT............................................................................ 11

STANDARD OF REVIEW ................................................................................. 13

ARGUMENT........................................................................................................ 14

THE DISTRICT COURT CORRECTLY HELD THAT NEITHER ABB
    NOR VRLC HAS ARTICLE III STANDING TO APPEAL. ......................... 14

    A.    Binding Precedent Requires "Direct Interference" To Establish
           Organizational Standing.................................................................14

    B.    Neither ABB Nor VRLC Satisfies The Direct Interference
           Requirement...................................................................................22

           1.    Neither ABB Nor VRLC Establishes Direct Interference
                With Its Organizational Activities. ..................................22

           2.    ABB's Procedural Standing Theory Is Meritless. ...........31

CONCLUSION .................................................................................................... 35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Hensel Phelps Constr. Co.*,
   909 F.3d 723 (5th Cir. 2018)...............................................................................21

*Alabama v. Cardona*,
   No. 24-cv-533, 2024 WL 3607492 (N.D. Ala. July 30, 2024)..........................6

*Alabama v. U.S. Sec'y of Educ.*,
   No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024).........................6

*Alabama v. U.S. Sec'y of Educ.*,
   No. 24-12444, 2024 WL 4003397 (11th Cir. July 31, 2024) ..........................6

*Alliance for Hippocratic Med. v. FDA*,
   No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) (per curiam)..................15

*Alliance for Hippocratic Med. v. U.S. FDA*,
   668 F. Supp. 3d 507 (N.D. Tex. 2023)..............................................................15

*Arizona v. City & County of San Francisco*,
   596 U.S. 763 (2022) ............................................................................................32

*Arkansas v. U.S. Dep't of Educ.*,
   742 F. Supp. 3d 919 (E.D. Mo. 2024) ..............................................................6

*Association of Cmty. Orgs. for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999)..............................................................................20

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024)...............................................................................29

*Bost v. Illinois State Board of Elections*,
   146 S. Ct. 513 (2026)...........................................................................................21

*Buckley v. Valeo*,
   424 U.S. 1 (1976) (per curiam) ...........................................................................1

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
   108 F.4th 340 (5th Cir. 2024) ............................................................................19

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
741 F. Supp. 3d 515 (N.D. Tex. 2024) ................................................6

*Deep South Center for Environmental Justice v. U.S. EPA*,
138 F.4th 310 (5th Cir. 2025) ...........................................*passim*

*Department of Educ. v. Brown*,
600 U.S. 551 (2023) .............................................................. 13, 32

*Department of Educ. v. Louisiana*,
603 U.S. 866 (2024) (per curiam) ...................................... 1, 7

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................................................................29

*Edwards v. City of Houston*,
78 F.3d 983 (5th Cir. 1996) (en banc) ............................... 3, 4

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ...........................................................*passim*

*Federal Election Comm'n v. NRA Pol. Victory Fund*,
513 U.S. 88 (1994) ............................................................... 13, 31

*H&D Tire & Automotive-Hardware, Inc. v. Pitney Bowes Inc.*,
227 F.3d 326 (5th Cir. 2000) ...............................................18

*Habeas Corpus Res. Ctr. v. U.S. DOJ*,
816 F.3d 1241 (9th Cir. 2016) ...............................................28

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .........................................................*passim*

*In re Bonvillian Marine Serv., Inc.*,
19 F.4th 787 (5th Cir. 2021) .................................................21

*In re Highland Cap. Mgmt., L.P.*,
74 F.4th 361 (5th Cir. 2023) ................................................20

*Kansas v. U.S. Dep't of Educ.*,
739 F. Supp. 3d 902 (D. Kan. 2024) ....................................6

*La Union Del Pueblo Entero v. Abbott*,
151 F.4th 273 (5th Cir. 2025) ...............................................19

*Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*,
No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam).......................7

*Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC.*,
82 F.4th 345 (5th Cir. 2023)...................................................................................10, 24

*Louisiana v. Haaland*,
86 F.4th 663 (5th Cir. 2023)....................................................................................10, 14

*Louisiana v. U.S. Dep't of Educ.*,
737 F. Supp. 3d 377 (W.D. La. 2024)..............................................................................6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).............................................................................................32, 33

*Massachusetts v. EPA*,
549 U.S. 497 (2007).....................................................................................................34

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025) (per curiam)....................................................................18

*National Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998).....................................................................................................30

*National Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) ................................................................................33, 34

*OCA-Greater Hou. v. Texas*,
867 F.3d 604 (5th Cir. 2017)........................................................................................20

*Odle v. Flores*,
899 F.3d 342 (5th Cir. 2017) (per curiam) ...................................................................14

*Oklahoma v. Cardona*,
743 F. Supp. 3d 1314 (W.D. Okla. 2024) .......................................................................6

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ...................................................................................25

*Robinson v. J & K Admin. Mgmt. Servs., Inc.*,
817 F.3d 193 (5th Cir. 2016).......................................................................................21

*Shami v. Commissioner*,
741 F.3d 560 (5th Cir. 2014)........................................................................................19

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
968 F.3d 419 (5th Cir. 2020) (per curiam) ........................................................33

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ...........................................................................................22

*South Carolina State Conf. of the NAACP v. S. Carolina Dep't of Juvenile Justice*,
--- F.4th ----, 2026 WL 233528 (4th Cir. 2026) ...........................................26, 29

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ...........................................................11, 13, 32, 34

*Tennessee v. Cardona*,
737 F. Supp. 3d 510 (E.D. Ky. 2024) ..................................................................6

*Tennessee v. Cardona*,
762 F. Supp. 3d 615 (E.D. Ky. 2025) ...........................................................1, 8

*Tennessee v. Cardona*,
No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024)...................................7

*Tenth St. Residential Ass'n v. City of Dallas*,
968 F.3d 492 (5th Cir. 2020) ...........................................................18, 24

*Texas Corn Producers v. U.S. EPA*,
141 F.4th 687 (5th Cir. 2025) ...........................................................29, 30

*Texas Tribune v. Caldwell County*,
121 F.4th 520 (5th Cir. 2024) ...........................................................................27

*Texas v. United States*,
740 F. Supp. 3d 537 (N.D. Tex. 2024) ...........................................6, 25, 27

*United States ex rel. Hernandez v. Team Fin., LLC*,
80 F.4th 571 (5th Cir. 2023) ...........................................................................13

*United States v. Mendoza*,
464 U.S. 154 (1984) ...........................................................................2, 31

*United States v. Providence J. Co.*,
485 U.S. 693 (1988) ...........................................................................................31

*United States v. Texas*,
144 F.4th 632 (2025) ...........................................................................19

*United States v. Texas,*
   599 U.S. 670 (2023) ..................................................................................30

*Virginia House of Delegates v. Bethune-Hill,*
   587 U.S. 658 (2019) ..................................................................................14

*Wisconsin Voter Alliance v. Mills,*
   --- F. 4th ----, 2026 WL 370269 (7th Cir. 2026)..............................26, 33

**Statutes**

20 U.S.C. § 1681 ........................................................................................ 4, 5

20 U.S.C. § 1682 ............................................................................................4

20 U.S.C. § 1686 ............................................................................................5

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1331 ............................................................................................3

**Executive Branch Materials**

34 C.F.R. § 106.10 .........................................................................................5

34 C.F.R. § 106.2 ...........................................................................................5

34 C.F.R. § 106.31 .........................................................................................5

34 C.F.R. § 106.40 .........................................................................................6

34 C.F.R. § 106.45 .........................................................................................6

*Keeping Men Out of Women's Sports,*
   90 Fed. Reg. 9279 (Feb. 11, 2025) ..............................................................8

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
   Financial Assistance,*
   85 Fed. Reg. 30,026 (May 19, 2020) ...........................................................4

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
   Financial Assistance,*
   89 Fed. Reg. 33,474 (Apr. 29, 2024) ...........................................................1

# INTRODUCTION

This litigation concerns a Department of Education rule that has been found unlawful by virtually every court to consider it. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). Prior to the change in administration in January 2025, the government pursued all available appeals, even after "all Members" of the Supreme Court concluded that "plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule" and a majority of the Court held that the government had not articulated a sufficient basis to sever those provisions from the remainder of the Rule. *See Department of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (per curiam). Pursuing that maximally aggressive litigation strategy, even in the face of nearly universal adverse rulings, was of course the government's prerogative.

Following the change in administration, the government changed course and decided that it would no longer pursue such appeals. It therefore declined to appeal from the final judgment in this case, ROA.4867-4874, which vacated the rule on a nationwide basis, or from a similar judgment in *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025). That too was the government's prerogative: the Executive Branch is responsible for "conducting civil litigation in the courts of the United States," *Buckley v. Valeo*, 424 U.S. 1, 138, 140 (1976) (per curiam), and in deciding whether to appeal from an adverse judgment, "the Solicitor General considers a variety of factors, such as the limited resources of the Government and the crowded

dockets of the courts, before authorizing an appeal," *United States v. Mendoza*, 464 U.S. 154, 161 (1984).

The question now is whether two private organizations—A Better Balance (ABB) and Victim Rights Law Center (VRLC)—may intervene and appeal in the government's stead. Each organization supports the Rule, believes that it would be better able to achieve its policy goals if the Rule were in place, and therefore wants to challenge the invalidation of the Rule in this case. The district court denied intervention, finding that neither organization had Article III standing because the Rule does not prevent either organization from performing its functions.

That ruling was unquestionably correct. Although old cases like *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), have sometimes been understood to confer Article III standing on organizations that spend resources to achieve their policy goals, the Supreme Court decisively rejected that theory in *FDA v. Alliance for Hippocratic Medicine*, explaining that it "is incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. 367, 395 (2024). Following *Alliance*, this Court reiterated in *Deep South Center for Environmental Justice v. U.S. EPA*, 138 F.4th 310 (5th Cir. 2025), that an organizational plaintiff must establish "direct interference" with its operations to establish standing and that even if certain actions "make[] it more difficult" for an organizational plaintiff to "achieve its mission," that is "not the kind of impediment *Alliance* requires." *Id.* at 319 (quotation marks omitted).

2

*Alliance* and *Deep South Center* control this appeal. Each putative intervenor contends that the district court's vacatur of the Rule will make it more difficult for it to achieve its policy goals—that because of the vacatur, it will be more difficult to obtain favorable results for students who are pregnant or allege that they have been victims of sexual harassment. VRLC even alleges that because of the vacatur, fewer students may seek its services in the first place. Yet both organizations remain entirely free to perform their functions free of government restraint, which means that neither has demonstrated the "direct interference" that precedent requires. This Court should affirm the district court's order denying the motions to intervene.

## STATEMENT OF JURISDICTION

Plaintiff invoked the jurisdiction of the district court under 28 U.S.C. § 1331. ROA.33. On February 19, 2025, the district court entered judgment in plaintiff's favor and vacated the Rule. ROA.4875. While putative intervenors' motions to intervene were pending, the district court extended their deadline to appeal to May 21, 2025. ROA.5358. On May 15, 2025, the district court denied the motions to intervene. ROA.5539. Putative intervenors filed notices of appeal on May 21, 2025, in each case purporting to appeal from both the final judgment and the denial of intervention. ROA.5555, 5558.

The denial of a motion to intervene of right is appealable under 28 U.S.C. § 1291. *See Edwards v. City of Houston*, 78 F.3d 983, 992 (5th Cir. 1996) (en banc). The

denial of a motion seeking permissive intervention is appealable under 28 U.S.C. § 1291 only if the denial constituted an abuse of discretion.  *Id.*

## STATEMENT OF THE ISSUE

Whether the district court properly denied intervention because ABB and VRLC lack Article III standing.

## STATEMENT OF THE CASE

### A.     Title IX And The Rule

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Congress authorized the Department to "issu[e] rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute."  *Id.* § 1682.  Since Title IX's enactment, the Department has promulgated regulations implementing the statute, including landmark regulations in 2020.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

In 2024, the Department substantially amended the 2020 regulations by issuing the Rule.  Among other things, the Rule contained three provisions concerning gender identity and sexual harassment.  First, Section 106.10 provided that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation,

and gender identity." 34 C.F.R. § 106.10.  Second, Section 106.31(a)(2) stated that

Title IX generally permits "different treatment or separation on the basis of sex" only

to the extent that such differential treatment or separation does not "discriminate[] …

by subjecting a person to more than de minimis harm" and that "a policy or …

practice that prevents a person from participating in an education program or activity

consistent with the person's gender identity subjects a person to more than de

minimis harm on the basis of sex." *Id.* § 106.31(a)(2).  The upshot of this provision

was that a person must generally be permitted to use the sex-separate facilities

(including bathrooms and locker rooms) that align with the person's gender identity

even where that identity differs from sex assigned at birth.[1]  Finally, Section 106.2

defined many terms, including "sex-based harassment," which it defined to include

"[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is

subjectively and objectively offensive and is so severe or pervasive that it limits or

denies a person's ability to participate in or benefit from the recipient's education

program or activity (*i.e.*, creates a hostile environment)." *Id.* § 106.2.

The Rule made numerous other changes to the 2020 regulations, two sets of

which are relevant to this appeal.  First, the Rule revised requirements related to

pregnant and postpartum students, generally requiring that schools provide such

---

[1] The provision acknowledged that Congress carved out certain contexts in which a school may permissibly differentiate based on sex even though greater than de minimis harm may result.  *See, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (sex-separate living facilities).

students reasonable modifications, lactation space, and information about their rights. *See generally* 34 C.F.R. § 106.40(b).  Second, the Rule withdrew or revised various provisions in the 2020 regulations that were intended to assure fairness and accuracy when resolving complaints of sexual harassment, including requirements that live cross-examination be available in the post-secondary context and that the investigator not be the same person as the decisionmaker.  *See generally id.* §§ 106.45-106.46.

### B.    Litigation Concerning The Rule

The Rule was challenged in litigation across the country, and virtually every court to consider the Rule determined that it was unlawful.  *See Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377 (W.D. La. 2024) (entering preliminary injunction); *Tennessee v. Cardona*, 737 F. Supp. 3d 510 (E.D. Ky. 2024) (same); *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902 (D. Kan. 2024) (same); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515 (N.D. Tex. 2024) (same); *Texas v. United States*, 740 F. Supp. 3d 537 (N.D. Tex. 2024) (same); *Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919 (E.D. Mo. 2024) (same); *Oklahoma v. Cardona*, 743 F. Supp. 3d 1314 (W.D. Okla. 2024) (same).[2]

---

[2] The only contrary decision was *Alabama v. Cardona*, No. 24-cv-533, 2024 WL 3607492 (N.D. Ala. July 30, 2024), which denied a preliminary injunction because it believed that the plaintiff had failed to adequately brief the issues.  The Eleventh Circuit entered an administrative injunction the following day, *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 4003397 (11th Cir. July 31, 2024), followed shortly by an injunction pending appeal, *Alabama*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024).

The government asked both this Court and the Sixth Circuit to partially stay certain of the preliminary injunctions—that is, to permit the provisions other than those addressing sexual orientation, gender identity, and hostile-environment harassment to take effect. Both courts refused to do so. *See Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024). In particular, this Court indicated that it was unwilling "to maintain, on a temporary basis, tangential provisions that might or might not have been formulated in the absence of the heart of the Rule." *Louisiana*, 2024 WL 3452887, at *2.

The government then made the same request of the Supreme Court, which likewise denied it. *See Department of Educ. v. Louisiana*, 603 U.S. 866 (2024) (per curiam). In denying the government's motion, the Supreme Court expressly stated that "all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Id.* at 867. The majority further indicated that the government had not provided a "sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Id.* at 868.

The cases that reached final judgment likewise were resolved against the government. In each case, the district court determined that the Rule was unlawful

and that nationwide vacatur was the appropriate remedy. Those decisions included

the decision in this case, ROA.4867-4874, as well as *Tennessee v. Cardona*, 762 F. Supp.

3d 615 (E.D. Ky. 2025).

Following the change in administration, the President issued Executive Order

No. 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025),

which directed the Department to "comply with the vacatur" of the Rule in the

*Tennessee* litigation and otherwise "take other appropriate action to ensure this

regulation does not have effect." *Id.* at 9279. Consistent with the Executive Order,

the government did not appeal from the final judgments in *Tennessee* or in this case.

## C.    Post-Judgment Proceedings In This Case

As set out above, the district court in this case entered final judgment vacating

the Rule on February 19, 2025. ROA.4867-4874. ABB and VRLC moved to

intervene on March 25, 2025, and March 31, 2025, respectively.[3] ROA.4883, 4998.

ABB is a "a national nonprofit organization that advocates for pregnant and

caregiving workers and students," and it sought intervention to defend the provisions

of the Rule "that protect pregnant and postpartum students." ROA.4889. It

suggested that the vacatur of the Rule "impairs ABB's ability to assist pregnant and

postpartum students who call them seeking legal assistance" and "requires ABB to

---

[3] VRLC's motion also sought intervention on behalf of Jane Doe, a
pseudonymous student who alleged that she had been a victim of sexual assault. *See*
ROA.4988. The district court denied Ms. Doe intervention, *see* ROA.5552-5554, and
she now acknowledges that her claims have become moot, *see* VRLC Br. 10 n.5.

expend additional resources when counseling students—resources it could otherwise devote to other efforts to protect its vulnerable client base." ROA.4889. It also suggested that it had suffered a procedural injury because the government had "us[ed] collusive litigation tactics … to rescind the Rule without going through the required notice and comment rulemaking." ROA.4889.

VRLC sought intervention on similar grounds. It described itself as "a nonprofit advocacy organization that provides legal assistance to student survivors of sex-based harassment" and sought "to intervene to appeal vacatur of the 2024 Title IX Rule's provisions that pertain to sex-based harassment," as well as "numerous protections for survivors in the 2024 Title IX Rule." ROA.4988-4989. VRLC contended that as a result of the vacatur, it must "spend more time and resources to assist each client and can assist fewer people." ROA.5007. In addition, VRLC suggested that the vacatur was "impairing its mission to redress and prevent sex-based harassment because the change discourages students from requesting its services and filing Title IX complaints with schools." ROA.5008.

While those motions were pending, the district court extended the putative intervenors' deadline to appeal to May 21, 2025. ROA.5358. On May 15, 2025, the court denied the motions to intervene. ROA.5539. In order to "appeal a decision that the primary party does not challenge," the court explained, "an intervenor must independently demonstrate standing." ROA.5542 (quoting *Louisiana v. Haaland*, 86

F.4th 663, 666 (5th Cir. 2023)).  The court then determined that both organizations failed that requirement because neither had suffered a cognizable injury.  ROA.5543.

The district court first determined that "[n]one of ABB's alleged injuries have perceptibly impaired its ability to carry out its mission."  ROA.5545.  "To the contrary, the efforts ABB has taken to counteract the effects of the Court's vacatur of the Final Rule 'would appear to advance, rather than impair, [ABB's] mission of' providing legal services and assisting workers and students through its helpline." ROA.5545 (alteration in original) (quoting *Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC.*, 82 F.4th 345, 354 (5th Cir. 2023)).  As the court explained, "ABB has *furthered* its mission by spending more time with callers, counseling them on changes in the Title IX legal landscape, and providing them with legal services, all of which are part of ABB's routine organizational activities."  ROA.5545.

The district court determined that VRLC had failed to establish standing for similar reasons.  As the court explained, VRLC had not shown that the "vacatur of the Final Rule has perceptibly impaired its ability to provide legal representation to victims of sex-based harassment."  ROA.5548 (emphasis omitted).  Instead, "VRLC solely focuses on the negative affects its clients may experience as a result of the Court's vacatur of the Final Rule."  ROA.5548 (emphasis omitted).  And "the fact that its clients may not receive favorable outcomes in legal proceedings cannot be conflated as a perceptible impairment of VRLC's ability to fulfill its mission." ROA.5548.  Thus, while VRLC "must now navigate new and complicated legal issues

in light of the vacatur of the Final Rule," "by no means is VRLC restricted from continuing to legally represent victims of sex-based harassment." ROA.5548.

The district court rejected putative intervenors' invocation of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). ROA.5549. The court explained that "the Court's vacatur of the Final Rule has not perceptibly impaired ABB and VRLC's ability to carry out their respective missions." ROA.5550, and it further recognized that the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), had significantly constrained the circumstances in which *Havens* applies. *See* ROA.5550.

The district court rejected ABB's invocation of procedural standing. ROA.5551. As it explained, "[d]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." ROA.5551 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

Putative intervenors filed notices of appeal on May 21, 2025, in each case purporting to appeal from both the final judgment and the denial of intervention. ROA.5555, 5558.

## SUMMARY OF ARGUMENT

This Court should affirm because the district court properly denied intervention for lack of Article III standing.

11

**A.** The modern test for organizational standing is set forth in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and this Court's decision in *Deep South Center for Environmental Justice v. U.S. EPA*, 138 F.4th 310 (5th Cir. 2025). Although certain cases once took a broader view of organizational standing, concluding that it was available whenever an organization responded to a government action with which it disagreed by expending resources to achieve its mission, an organizational plaintiff must now show "direct interference" to establish standing. *Deep S. Ctr.*, 138 F.4th at 319. Thus, even if certain actions "make[] it more difficult" for an organizational plaintiff to "achieve its mission," that is "not the kind of impediment *Alliance* requires." *Id.* (quotation marks omitted). Putative intervenors cannot avoid this controlling precedent by invoking case law that predates *Alliance* or entirely ignores *Deep South Center*.

**B.1.** Neither ABB nor VRLC has established direct interference. The heart of the organizations' standing theory is that, as a result of the vacatur, it will be more difficult for them to obtain favorable results for their clients. That theory of organizational standing, however, is squarely foreclosed by *Alliance* and *Deep South Center*. The putative intervenors labor to compare this case to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), but the key point of *Havens* was that by providing false information to the plaintiffs, the defendants' actions "directly affected and interfered with [the plaintiffs'] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Alliance*, 602 U.S. at 395.

12

While it is true that ABB and VRLC provide some services to individuals, that is not itself sufficient to bring this case within the unique facts of *Havens*. Nor may VRLC establish standing by contending that fewer individuals are seeking its services.

**2.** ABB's procedural standing argument is meritless. ABB asserts that the government engaged in "collusive litigation" by failing to appeal from the adverse judgment in this case, but that is simply wrong. The United States routinely elects not to appeal from adverse judgments based on its evaluation of "a number of factors which do not lend themselves to easy categorization." *Federal Election Comm'n v. NRA Pol. Victory Fund*, 513 U.S. 88, 96 (1994). The decision not to continue pressing arguments that had been rejected by virtually every court to consider them—including the Supreme Court—was hardly improper. And in any event, even if ABB had plausibly identified a procedural violation, that still would not suffice because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.'" *Department of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

## STANDARD OF REVIEW

This Court exercises de novo review over whether a party has established Article III standing to intervene. *United States ex rel. Hernandez v. Team Fin., LLC*, 80 F.4th 571, 577 (5th Cir. 2023).

# ARGUMENT

## THE DISTRICT COURT CORRECTLY HELD THAT NEITHER ABB NOR VRLC HAS ARTICLE III STANDING TO APPEAL.

It is undisputed that, to appeal a decision that an existing party does not challenge, a putative intervenor must independently establish Article III standing. *See Louisiana v. Haaland*, 86 F.4th 663, 666 (5th Cir. 2023) (citing *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019)). Such a party must therefore "satisfy the usual standards for injury in fact, causation, and redressability." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024).

Neither ABB nor VRLC comes close to satisfying these requirements. That conclusion flows inexorably from both the Supreme Court's decision in *Alliance* and this Court's decision in *Deep South Center for Environmental Justice v. U.S. EPA*, 138 F.4th 310 (5th Cir. 2025), which is controlling precedent that establishes the correct interpretation of *Alliance* under this Court's rule of orderliness.[4]

### A. Binding Precedent Requires "Direct Interference" To Establish Organizational Standing.

Prior to the Supreme Court's decision in *Alliance*, certain cases had understood the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), to

---

[4] The district court denied intervention for lack of Article III standing, and this Court should affirm on that basis. If the Court determines that ABB or VRLC did in fact have standing, it should remand for the district court to perform the Rule 24 analysis in the first instance. *See Odle v. Flores*, 899 F.3d 342, 344 (5th Cir. 2017) (per curiam) ("According to Wal-Mart, if jurisdiction is found to exist, we should remand for consideration of Rule 24's basic requirements. We agree.").

mean that organizations could establish Article III standing by contending that they had chosen to commit additional resources to achieving their organizational goals and counteracting government action with which they disagree. Both the Supreme Court and this Court have now decisively rejected that expansive theory of standing.

1. In *Alliance*, the Supreme Court held that organizational plaintiffs lacked standing to challenge FDA's loosening of "regulatory requirements for mifepristone." 602 U.S. at 372. The district court had determined that certain medical associations opposed to FDA's actions had standing because "FDA's actions have frustrated their ability to educate and inform their member physicians, their patients, and the public on the dangers of chemical abortion drugs," requiring plaintiffs to "divert[] valuable resources away from advocacy and educational efforts to compensate for the lack of information." *Alliance for Hippocratic Med. v. U.S. FDA*, 668 F. Supp. 3d 507, 527 (N.D. Tex. 2023). This Court denied a stay, finding that "FDA's actions have frustrated [the plaintiffs'] organizational efforts to educate their members and the public on the effects of mifepristone." *Alliance for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *11 (5th Cir. Apr. 12, 2023) (per curiam). And in the Supreme Court, the associations contended that they had been forced to "conduct their own studies on mifepristone," which required them to expend "considerable resources to the detriment of other spending priorities." *Alliance*, 602 U.S. at 394 (quotation marks omitted); *see also* Transcript of Oral Argument at 64, *Alliance*, 602 U.S. 367 (No. 23-235) ("[T]hey've been forced to divert resources from speaking and

advocating for their pro-life mission generally to explaining the dangers of the harm from abortion drugs.").

The Supreme Court unanimously rejected these theories and held that the associations lacked standing. It explained that it "is incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions," as organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394-95. Absent an actual "impediment to [their] advocacy business[]," the assertions of generic setbacks to their missions did not suffice. *Id.* at 395.

*Alliance* acknowledged the earlier decision in *Havens*, which had found standing for a housing counseling organization (HOME) after a company (Havens) that owned and operated apartments falsely told HOME's testers that no apartments were available for rent. *See generally* 455 U.S. 363. As *Alliance* explained, the critical fact of *Havens* is that "Havens had provided HOME's black employees false information about apartment availability." 602 U.S. at 395. Because "Havens gave HOME's employees false information," the defendant's "actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* Put simply, *Havens* was "an unusual case" whose holding must not be extended "beyond its context." *Id.* at 396.

**2.**    This Court applied *Alliance* in *Deep South Center*, which issued shortly
after the district court denied intervention here.  In *Deep South Center*, an
environmental organization challenged an EPA rule granting the State of Louisiana
primary enforcement authority over certain wells.  It contended that EPA's action had
forced and would "continue to force it to reallocate significant resources from its
various direct service programming." *Deep S. Ctr.*, 138 F.4th at 317 (alteration and
quotation marks omitted).

This Court explained that after *Alliance*, "[o]nly in the rarest cases can
organizations demonstrate standing by showing a defendant's action interferes with
their activities." *Deep S. Ctr.*, 138 F.4th at 318.  In other words, after *Alliance*, an
organizational plaintiff must show "direct interference" with its operations. *Id.* at 319.
Even if certain actions "make[] it more difficult" for an organizational plaintiff to
"achieve its mission," that is "not the kind of impediment *Alliance* requires." *Id.*
(quotation marks omitted).  And because Deep South Center had not been
"prevent[ed] … from engaging in its advocacy, education, and training activities" or
"compel[led] … to take any action," *id.* at 319-20, it could not establish standing.  The
Court thus reiterated that *Alliance* had "limited *Havens* to its facts." *Id.* at 319.

Even without *Alliance*, the Court continued, Deep South Center would have
lacked standing.  Before *Alliance*, circuit precedent made clear that a cognizable
diversion of resources must "detract or differ from [the organization's] routine
activities." *Deep S. Ctr.*, 138 F.4th at 320 (quoting *Tenth St. Residential Ass'n v. City of*

*Dallas*, 968 F.3d 492, 500 (5th Cir. 2020)). Thus, Deep South Center's choice to engage in other "types of education and advocacy" in response to EPA's actions did not suffice because those were its core functions. *Id.*

**3**.     Taken together, *Alliance* and *Deep South Center* establish the modern framework for evaluating organizational standing. Two additional post-*Alliance* cases nevertheless bear mention.

First, both putative intervenors place significant weight on *Nairne v. Landry*, 151 F.4th 666 (5th Cir. 2025) (per curiam), where a panel of this Court held that certain advocacy organizations had standing to challenge Louisiana's redistricting because it "interfered directly with the [organizations'] core operations—namely, advancing Black political participation." *Id.* at 682. The panel accepted as sufficient the organizations' contentions that they "were forced to reallocate staff and launch new initiatives to mitigate the effects of the maps on Black voter confidence and candidate viability." *Id.* The panel did not distinguish—or even acknowledge—the entirely irreconcilable decision in *Deep South Center.*[5] And under this Court's rule of orderliness, "[w]hen panel opinions appear to conflict, [the Court is] bound to follow the earlier opinion." *H&D Tire & Automotive-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 330 (5th Cir. 2000); *accord, e.g., Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108

---

[5] As of the date of this filing, (1) Louisiana's en banc petition in *Nairne* remains pending, and (2) this Court has stayed proceedings pending the Supreme Court's decision in *Louisiana v. Callais*, No. 24-109 (U.S. filed Aug. 1, 2024).

F.4th 340, 350 (5th Cir. 2024); *Shami v. Commissioner*, 741 F.3d 560, 569 (5th Cir. 2014).

Because *Nairne* is irreconcilable with the earlier decision in *Deep South Center*, the

earlier decision controls. *See also La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273,

287 (5th Cir. 2025) (reiterating, after *Nairne*, that "diverting resources in response to a

defendants' actions does not establish standing" (alterations and quotation marks

omitted)).[6]

The other pertinent recent case is *United States v. Texas*, 144 F.4th 632 (2025),

where a divided panel of this Court permitted a nonprofit legal services organization

to challenge a Texas state law addressing the presence of noncitizens within the state.

As Judge Oldham observed in dissent, that decision "expands *Havens*, ignores *Alliance*,

and thus turns standing doctrine on its head." *Id.* at 695 (Oldham, J., dissenting).

This Court has since granted rehearing en banc and vacated the panel opinion. *See*

Order, *United States v. Texas*, No. 24-50149 (5th Cir. Aug. 29, 2025), Dkt. No. 332-1.

The case was reheard before the en banc Court on January 22, 2026, and a decision is

pending.

**4.** In addition to these post-*Alliance* cases, both ABB and VRLC place

significant weight on earlier case law. *See, e.g.*, ABB Br. 25-26 (first citing *OCA-Greater*

---

[6] ABB suggests that *Nairne* supersedes *Deep South Center* because it "narrow[s]" its holding. *See* ABB Br. 31 n.1 (quoting *Knight v. Kirby Offshore Marine Pac., LLC*, 983 F.3d 172, 182 (5th Cir. 2020) (Ho, J., concurring)). But *Nairne* did not "narrow" *Deep South Center*'s holding; instead, it proceeded as if that directly applicable decision had never issued. That is precisely the situation that the rule of orderliness is meant to address.

*Hou. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); and then citing *Association of Cmty.*

*Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 (5th Cir. 1999)); VRLC Br. 24

(similar).  Those cases predate the Supreme Court's authoritative decision in *Alliance*,

rendering them inapplicable to the extent that they adopt a broader understanding of

organizational standing than *Alliance* permits.  ABB suggests that these cases are

consistent with *Alliance* because they "already distinguished between a true

impediment to an organization's pre-existing direct services, which confers standing,

and voluntary issue advocacy like the lobbying in *Alliance*, which does not."  ABB Br.

29.  But various pre-*Alliance* cases had premised standing on findings that challenged

actions had "deterred" persons from voting, requiring an organization to "calibrate[]

its outreach efforts," *OCA-Greater Hou.*, 867 F.3d at 610, or that an organization had

"expended definite resources counteracting the effects of Louisiana's alleged failure to

implement" a statutory provision, *Association of Cmty. Orgs. for Reform*, 178 F.3d at 360.

Those sorts of these theories do not survive *Alliance*.  *See* 602 U.S. at 395 (rejecting

premise that "standing exists when an organization diverts its resources in response to

a defendant's actions" because "that theory would mean that all the organizations in

America would have standing to challenge almost every federal policy that they

dislike").

  ABB nevertheless contends that these cases remain good law because *Alliance*

did not "unequivocally overrule" them.  ABB Br. 28 (emphasis omitted) (quoting *In re*

*Highland Cap. Mgmt., L.P.*, 74 F.4th 361, 368 (5th Cir. 2023)).  But "[w]hether an

intervening Supreme Court decision 'merely illuminates' or 'unequivocally overrules' is a judgment call—there is no hard-and-fast requirement, for instance, that a Supreme Court decision explicitly overrule the circuit precedent at issue, or specifically address the precise question of law at issue." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* This occurs, among other contexts, "where 'an intervening Supreme Court decision fundamentally change[s] the focus' of the relevant analysis." *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 742 (5th Cir. 2018) (alteration in original) (quoting *Robinson v. J & K Admin. Mgmt. Servs., Inc.*, 817 F.3d 193, 197 (5th Cir. 2016)). As this Court recognized in *Deep South Center*, the Supreme Court fundamentally changed the analysis of organizational standing in *Alliance*.[7]

---

[7] Nor does *Bost v. Illinois State Board of Elections*, 146 S. Ct. 513 (2026), undermine *Alliance*. In *Bost*, the Supreme Court acknowledged that election rules that "require [a candidate] to expend additional resources" can support standing. *See id.* at 519. But that is because candidates "have an obvious personal stake in how the result is determined and regarded," and "[d]epartures from the preordained rules cause them particularized and concrete harm." *Id.* at 520. Third-party groups like those at issue here have no comparable interest.

**B.     Neither ABB Nor VRLC Satisfies The Direct Interference Requirement.**

**1.     Neither ABB Nor VRLC Establishes Direct Interference With Its Organizational Activities.**

Applying the proper standing framework, neither ABB nor VRLC can establish standing because neither is an object of the regulatory scheme, neither is directly impeded from performing its functions by the vacatur of the Rule, and neither has been forced to divert resources from its routine organizational functions. Instead, each simply contends that it is adjusting its organizational activities as a result of the vacatur. The organizations' continued efforts to achieve their policy goals are manifestly insufficient, for "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," does not establish standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

**a.**     The putative intervenors' asserted injuries are all similar. ABB asserts that it "offers a free legal helpline to counsel pregnant and parenting students who face discrimination," and that without the "clear protections" provided by the Rule, "ABB lawyers must spend significantly more time and resources to respond to each call." ABB Br. 20. "And because ABB must devote more time to each caller, it cannot provide as many services to as many people." *Id.* ABB further asserts that without a provision requiring schools to affirmatively provide information about pregnant students' rights, "ABB must spend resources to provide students basic

information about Title IX and Title IX coordinators." ABB Br. 20. And even with those efforts, ABB contends, it "achieves worse results than it would if the Rule were in place." ABB Br. 22-23. VRLC's purported injuries are similar: it suggests that the vacatur "requir[es] VRLC to spend time adapting its services to the new regulatory requirements," which "impose higher hurdles on VRLC's clients." VRLC Br. 18. And the "increased time and resources necessary to assist each client also mean [that] VRLC is able to serve fewer clients." VRLC Br. 18-19. It further asserts that the vacatur has "caused VRLC to lose clients" and suffer "decreased business," VRLC Br. 18, as students are now "more hesitant to continue their pending Title IX complaints," ROA.5035.

None of these theories survives *Alliance* and *Deep South Center*. Reduced to their essence, ABB and VRLC simply contend that as a result of the vacatur, the substantive law about which they advise clients has changed, such that (1) it is more time-consuming to advise clients, (2) it is more difficult to obtain favorable results for clients, and (3) in VRLC's case, clients are less likely to seek its services. None of those theories comes close to demonstrating "direct interference": even if it is more difficult for ABB and VRLC to "achieve [their] mission[s]," they have not been "prevent[ed] … from engaging in [their] advocacy, education, and training activities" or "compel[led] … to take any action." *Deep S. Ctr.*, 138 F.4th at 319-20. They therefore lack standing to challenge the vacatur of the Rule.

*Deep South Center* also reiterates that a cognizable diversion of resources must "detract or differ from [the organization's] routine activities." 138 F.4th at 320 (quoting *Tenth St. Residential Ass'n*, 968 F.3d at 500); *see also Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 351 (5th Cir. 2023). But as the district court observed, none of the actions that ABB and VRLC have taken in response to the vacatur differs from their routine activities, further underscoring why standing does not exist. *See* ROA.5545 (ABB's "alleged counteractions … squarely comport with ABB's mission and purpose as an organization to provide legal services and counseling."); ROA.5549 ("[T]he fact that VRLC is spending time and resources providing legal assistance and representing students in grievance proceedings squarely comports with its routine activities.").

**b.**    Notwithstanding the clarity of *Alliance* and *Deep South Center*, ABB suggests that it is alleging injuries "just like" those in *Havens* because in each case, the defendant's conduct "'frustrated'" the organization's policy goals. ABB Br. 24 (quoting *Havens*, 455 U.S. at 379). That argument rests on a misreading of *Havens* that *Alliance* rejected.

*Havens* itself made clear that standing requires more than "simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. As the Supreme Court explained in *Alliance*, the key point of *Havens* is that "Havens gave HOME's employees false information," such that Havens' "actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues

24

a manufacturer for selling defective goods to the retailer." 602 U.S. at 395. In other words, "the defendant [in *Havens*] told falsehoods *to the plaintiff*," *Texas*, 144 F.4th at 699 (Oldham, J., dissenting), who had "a specific legal right to truthful, non-discriminatory housing information," *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1100 (D.C. Cir. 2015) (Millett, J., dubitante). That direct interference with a specific legal right was central to the Supreme Court's holding; it is why "[t]he plaintiff HOME … suffered a real, concrete, and particularized injury … that differentiated it from every other conceivable plaintiff in the universe." *Texas*, 144 F.4th at 699 (Oldham, J., dissenting). But on ABB's understanding of *Havens*, every fair housing organization in the area would have had standing to challenge HOME's conduct because HOME's conduct was inconsistent with the mission to which it was committed. That is simply not the law. *See Alliance*, 602 U.S. at 395 (rejecting theory that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies"). *Alliance* "limited *Havens* to its facts," *Deep S. Ctr.*, 138 F.4th at 319, and the facts in this case are completely unlike those in *Havens*.

ABB nevertheless suggests that this case is not governed by *Alliance* because the asserted injuries there were "the 'costs' [the medical associations] incurred 'to oppose FDA's actions' by drafting 'petitions' and 'engaging in public advocacy and education' to share their views." ABB Br. 27 (quoting *Alliance*, 602 U.S. at 394). That is no different from this case: the organizations in *Alliance* were committed to educating the

public about the perceived dangers of mifepristone, and the organizations in this case are committed to educating students about their rights and otherwise advocating for those students.  In each case, the organizations believe that because the government is doing less, they must do more.  *Compare* Transcript of Oral Argument at 64, *Alliance*, 602 U.S. 367 (No. 23-235) ("[T]hey've been forced to divert resources from speaking and advocating for their pro-life mission generally to explaining the dangers of the harm from abortion drugs."), *with* ABB Br. 22 ("[W]ithout the Rule, ABB must spend resources to provide students basic information about Title IX and Title IX coordinators.").  The key point is that the vacatur does not preclude the putative intervenors from performing any of their functions; it simply changes the legal backdrop against which they do so.  *Accord, e.g.*, *Wisconsin Voter Alliance v. Mills*, --- F. 4th ----, 2026 WL 370269, at *7 (7th Cir. 2026) (organization must show "concrete disruptions to mission-critical business operations"); *South Carolina State Conf. of the NAACP v. S. Carolina Dep't of Juvenile Justice*, --- F.4th ----, 2026 WL 233528, at *5-6 (4th Cir. 2026) (similar).

Inchoate conflict with an organization's social and policy goals is entirely different from the sorts of injuries that might suffice under Article III.  In *Texas Tribune v. Caldwell County*, for example, an organization of news outlets had standing to challenge a policy "categorically excluding the press and the public from observing criminal pretrial proceedings" because the policy applied to the plaintiff organizations themselves, which routinely accessed these proceedings.  121 F.4th 520, 524, 527 (5th

Cir. 2024).  So if the government had banned the dissemination of information about pregnant students' rights, an organization dedicated to disseminating such information (like ABB) would presumably have standing as the direct object of the regulation.  Or if the government banned the provision of legal advice to victims of sexual assault, an organization that provides such advice (like VRLC) would presumably have standing on the same theory.  But these scenarios are completely different from this case, as the vacatur of the Rule does not limit in any way the legal rights held by ABB and VRLC.

      **c.**      Both ABB and VRLC place significant weight on the fact that they provide services directly to individuals.  It is correct, of course, that *Havens* noted that the plaintiff there "not only was an issue-advocacy organization, but also operated a housing counseling service."  ABB Br. 28 (quoting *Alliance*, 602 U.S. at 395); *see also* VRLC Br. 22 (citing same passage).  But as Judge Oldham has explained, that sentence must be read in context: "the fact that HOME 'operated a housing counseling service' was 'critical[ ]' *only because* 'Havens gave HOME's employees false information about apartment availability.'"  *Texas*, 144 F.4th at 701 (Oldham, J., dissenting) (quoting *Alliance*, 602 U.S. at 395).  The mere fact that the organization in *Havens* operated a counseling service was not sufficient, which is why the specific organization that had been lied to had standing while every other counseling service committed to fair housing would not.

The putative intervenors' attempts to distinguish *Deep South Center* on the ground that the plaintiff there "engaged only in issue advocacy and did not provide direct services to people," ABB Br. 31; *see also* VRLC Br. 22, fail for similar reasons. Contrary to intervenors' argument, Deep South Center did more than just advocacy; it also engaged in "education" and "community engagement." *Deep S. Ctr.*, 138 F.4th at 318 (quotation marks omitted). As Deep South Center's reply brief in this Court explained, its "core business activities" include "direct service programming," including "job training, education, and community solar and renewable energy programs." Reply Brief of Petitioners at 10, *Deep S. Ctr.*, 138 F.4th 310 (No. 24-60084), 2024 WL 4243555, at *10. Like ABB and VRLC, Deep South Center thus contended that it was "distinguishable from the groups in *FDA v. Alliance*, which were solely advocacy businesses." *Id.* (quotation marks omitted). That argument did not work in *Deep South Center*, and it does not work here.

**d.** Nor is it sufficient that the vacatur alters underlying substantive law in a way that purportedly makes it more difficult for the putative intervenors to achieve favorable results for their clients. "Assisting and counseling clients in the face of legal uncertainty is the role of lawyers," and neither VRLC nor ABB has "cited any authority suggesting that lawyers suffer a legally cognizable injury in fact when they take measures to protect their clients' rights or alter their litigation strategy amid legal uncertainty." *Habeas Corpus Res. Ctr. v. U.S. DOJ*, 816 F.3d 1241, 1250 (9th Cir. 2016) (emphasis omitted). "Taken to its logical conclusion, this theory of injury

would permit attorneys to challenge any governmental action or regulation when doing so would make the scope of their clients' rights clearer and their strategies to vindicate those rights more easily selected." *Id.*; *see also South Carolina State Conf. of the NAACP*, 2026 WL 233528, at *6 (rejecting "doctrine of attorney standing that permits [an organization] to sue in place of its injured clients"). As the district court recognized, "[t]hough ABB and VRLC may be less successful in securing legal victories for their clients, this does not arise to cognizable injuries as they are still able to provide legal services and advocate for their clients in the absence of the Final Rule." ROA.5551; *see also* ROA.5548 ("[T]he fact that its clients may not receive favorable outcomes in legal proceedings cannot be conflated as a perceptible impairment of VRLC's ability to fulfill its mission.").

VRLC further suggests that it has standing because the vacatur has dissuaded individuals from seeking its services in the first place, causing it to suffer "decreased business." VRLC Br. 18. It is true that lost business is sometimes a cognizable injury under Article III. That can be true, for example, when the government regulates one type of business with the goal of affecting the business in which the plaintiff is engaged. *See, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113-14 (2025) (fuel sellers had standing to challenge electric vehicle mandate intended to depress demand for fuel); *Texas Corn Producers v. U.S. EPA*, 141 F.4th 687, 696 (5th Cir. 2025) (similar, as to automative fuel economy standards); *Book People, Inc. v. Wong*, 91 F.4th 318, 331 (5th Cir. 2024) (book sellers had standing to challenge law governing school districts'

purchase of books from book sellers).  This can also be true in the context of

competitor standing, when the government's underregulation of one party harms that

party's competitor.  *See National Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522

U.S. 479, 488 (1998).  But while there are a "variety of familiar circumstances where

government regulation of a third-party individual or business" may cause cognizable

injury to an unregulated plaintiff, *Alliance*, 602 U.S. at 384, that principle does not

support intervenors' standing in this case: VRLC has not identified a single decision

holding that attorneys have standing to challenge a change in the substantive law that

reduces demand for their services.[8]  And the ordinary rule is that downstream, indirect

financial injuries are not cognizable.  *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680

n.3 (2023) (Texas could not base standing on claim that federal policy would

"generate indirect effects on state revenues.").

At bottom, the direct interference required by *Alliance* and *Deep South Center*

must be more than just downstream economic loss.  VRLC suggests that downstream

economic loss itself *is* direct interference, *see* VRLC Br. 23 (citing *Texas Corn Producers*),

but that understanding of the law would write the direct interference requirement out

_____

[8] Intervenors' expansive theory of standing would also have the perverse effect
of creating a "heads-I-win, tails-you-lose" framework.  In other words, if substantive
law changed in a way that harms VRLC's clients, then VRLC would have standing
because it would be harder to achieve beneficial results for them.  But if substantive
law changed in a way that helped VRLC's clients, then VRLC would have standing
because its clients would have less need for legal services in the first place.

of the doctrine by permitting any economic loss to constitute direct inference. *Texas*

*Corn Producers*—which was not even an organizational standing case—does no such

thing.

### 2. ABB's Procedural Standing Theory Is Meritless.

Although VRLC does not press the point, ABB also contends that it has

standing because it has suffered a procedural injury. ABB Br. 38. According to ABB,

"the combination of the vacatur and the Government's subsequent collusive litigation

tactics are denying ABB procedural rights to participate in the regulatory process." *Id.*

ABB's contentions are both factually baseless and legally irrelevant.

First, the notion that the government has engaged in "collusive litigation" is

incorrect. The United States zealously litigated this case through final judgment. Yet

the United States does not appeal every adverse decision: "Unlike a private litigant

who generally does not forgo an appeal if he believes that he can prevail, the Solicitor

General considers a variety of factors, such as the limited resources of the

Government and the crowded dockets of the courts, before authorizing an appeal."

*United States v. Mendoza*, 464 U.S. 154, 161 (1984); *see also Federal Election Comm'n v.*

*NRA Pol. Victor Fund*, 513 U.S. 88, 96 (1994) ("Whether review of a decision adverse

to the Government … should be sought depends on a number of factors which do

not lend themselves to easy categorization."); *United States v. Providence J. Co.*, 485 U.S.

693, 702 n.7 (1988) (explaining that the Supreme Court "relies on the Solicitor

General to exercise … independent judgment and to decline to authorize petitions for

review in this Court in the majority of the cases the Government has lost in the courts of appeals").  As the concurring opinion ABB cites observes, "[a] new administration" is generally "entitled" to dismiss even existing appeals, *Arizona v. City & County of San Francisco*, 596 U.S. 763, 765 (2022) (Roberts, C.J., concurring)—to say nothing of declining to appeal every adverse judgment against it.  The Rule was a significant priority of the last administration, and the government was entitled to continue defending it even in the face of numerous adverse orders.  By the same token, however, the new administration is entitled to forgo appeals in defense of a Rule that court after court had found unlawful.  Either way, ABB certainly has no procedural right to participate in the government's decision-making on this score.

Second, even if there were some basis for ABB's criticism of the government's decision not to appeal, ABB cannot premise standing on a purported procedural violation because it has not identified a cognizable injury-in-fact for all the reasons described above.  "[W]hen a statute affords a litigant 'a procedural right to protect his concrete interests,' the litigant may establish Article III jurisdiction without meeting the usual 'standards for redressability and immediacy.'"  *Department of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  But even though the redressability and immediacy requirements are relaxed, the plaintiff must still "demonstrat[e] that it has a 'concrete interest that is affected by the deprivation'" of the claimed procedural right.  *Id.* at 562 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  The Supreme Court has thus repeatedly

emphasized that "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.'" *Id.* (quoting *Summers*, 555 U.S. at 496). Put differently, a party "can have standing to enforce procedural rights *only* if 'the procedures in question are designed to protect some threatened concrete interest' that is 'the ultimate basis of [the party's] standing.'" *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020) (per curiam) (emphasis added); *see also Wisconsin Voter Alliance*, 2026 WL 370269, at *8 ("The Supreme Court has cautioned us to guard the courthouse gates against procedural injuries masquerading as direct harm."). ABB has no cognizable concrete interest, rendering its allegations of procedural violations irrelevant.

ABB nevertheless contends that its obligation to identify a "concrete interest" is reduced in the context of a procedural claim. ABB Br. 40 (quoting *National Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 503 (5th Cir. 2024)). *Becerra* did indicate that "the concrete interest analysis is subject to a looser standard than the economic injury analysis," such that the plaintiff "could demonstrate a concrete interest, even if its economic injury theory failed." 116 F.4th at 503. But read in context, *Becerra* appeared to be referencing its earlier statements that a "procedural right can be asserted 'without meeting all the normal standards for redressability and immediacy,'" *id.* (quoting *Lujan*, 504 U.S. at 572 n.7), such that a litigant may demonstrate standing if "there is 'some possibility' that enforcing the procedural right 'will prompt the

33

[defendant] to reconsider the decision,'" *id.* (alteration in original) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)).

In any event, *Becerra* cannot (and did not purport to) overrule binding Supreme Court precedent providing that "the requirement of injury in fact is a hard floor of Article III jurisdiction" even in the context of a procedural claim. *Summers*, 555 U.S. at 497. To the contrary, *Becerra*'s finding that the plaintiff had identified a concrete interest was premised on the Court's conclusion that if the agency had engaged in notice and comment, the plaintiff "could explain to [the Department of Health and Human Services] the impact that drug price reductions would have on its margins (and corresponding ability to offer particular treatments or remain in business at all)." 116 F.4th at 504. Neither ABB nor VRLC asserts any comparable Article III interest, underscoring why they lack Article III standing no matter what substantive theory they assert.

## CONCLUSION

The Court should affirm the district court's order denying intervention.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

RYAN RAYBOULD
*United States Attorney*

CHARLES W. SCARBOROUGH

 *s/ Steven A. Myers*
STEVEN A. MYERS
DAVID L. PETERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8648*
*Steven.A.Myers@usdoj.gov*

February 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,636 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven A. Myers*
Steven A. Myers